E. A. BRANNEN AND FRANCES K. BRANNEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9669–79.     Filed March 30, 1982.

*John E. James*, for the petitioners.
*David D. Aughtry*, for the respondent.

SCOTT, *Judge*: Respondent determined a deficiency in the joint Federal income tax of Frances K. and E. A. Brannen

(petitioner) in the amount of $7,001 for the calendar year 1975. The issue for decision is whether petitioner, as a limited partner of Britton Properties, is entitled to deduct his distributive share of the losses from the partnership, which owned a movie as its principal asset.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners E. A. and Frances K. Brannen, husband and wife, who resided in Macon, Ga., at the time of filing their petition in this case, filed a joint Federal income tax return for the calendar year 1975 with the Internal Revenue Service Center in Chamblee, Ga.

Dr. Brannen is a medical doctor by profession. He has been engaged in the private practice of medicine for more than 32 years, specializing in obstetric-gynecology. He received his undergraduate degree in journalism and his medical degree from Emory University. Out of the proceeds of his medical practice, petitioner has made a number of investments in real estate but has never engaged in any activity related to the movie industry. Petitioner sold one of his real estate investments, a parking lot adjacent to his office building, on April 5, 1974, to the Charter Medical Co. His total gain on the sale amounted to $164,316.23, and he reported the sale on the installment method. He received payments in 1974 in the amount of $45,143.64, with a gain of $41,117.73. On December 27, 1974, petitioner sold his former office building, including the land on which it was situated, for a total amount of $53,812.85, with a gain of $38,818.68. The sale of the parking lot was negotiated about 3 or 4 months prior to the date of its sale, and the sale of the office building had been under negotiation for more than a year before the date of its sale.

Petitioner had been a long-time friend of Dr. Sweeney Sykes, who was a psychiatrist in Macon, Ga. Upon learning that petitioner would, during 1974, have a substantial amount of cash to invest, Dr. Sykes and his wife recommended a movie investment to petitioner similar to the one they had made through a close friend of theirs, Dr. W. L. Ryder. In late February or early March 1974, when Dr. Ryder was in Macon, petitioner was among those invited to Dr. Sykes' house for a

presentation. Dr. Ryder had practiced psychiatry in Atlanta, Ga., and subsequently practiced psychiatry in Shreveport, La. However, at the meeting, Dr. Ryder represented himself as an investment counselor and proceeded to give a presentation regarding the purchase of partnership interests in a New York limited partnership named "Britton Properties." About six or seven local businessmen and doctors attended the presentation.

Dr. Ryder explained that the limited partnership was to purchase a movie called "Beyond the Law." He presented the financial and tax aspects of the investment through the use of a flip chart. During the presentation, Dr. Ryder discussed the plot of the movie and explained the details of limited partnerships, nonrecourse loans, the income forecast method of depreciation, and the hypothetical financial projections prepared by Hecht, Brayer & Grill, certified public accountants. Petitioner received a number of documents at the meeting and made notations on many of them.

These documents included an opinion letter written by Mr. Robert M. Fink of the law firm of Troutman, Sanders, Lockerman & Ashmore of Atlanta, Ga. Petitioner regarded this letter as a very important document as it was an opinion of an independent law firm concerning the legal status of the entire investment. The letter was discussed during the presentation by Dr. Ryder. Petitioner reviewed the letter after he returned home and underscored some of the sentences which he considered to be of key importance. He also sent the letter to his personal lawyer, but only for a confirmation of whether or not this was a "good" law firm and whether Mr. Fink was qualified to write such an opinion. The opinion letter stated, among other things, that the partnership would be respected for Federal income tax purposes, that each limited partner's adjusted basis in the partnership would include his share of the nonrecourse partnership liabilities since the debt was a bona fide debt obligation, and that the seller of the film, Cinema Shares International, Ltd. (CSIL), was not related to the general partner or any of the limited partners of the partnership.

Another document distributed at the presentation was a statement from Sancrosiap, S.p.A. (Sancrosiap), the producer of the movie. This document listed the official production

costs, with the explanation of each item in Italian, and the actual costs in lire, with an asterisk by the total converting it to $1,453,448.37 in American dollars. It was represented at the presentation that this was the production cost of the movie. In addition, there was a certificate from Mr. Francis Scherten-leib, president of Pictures & Movies Establishment, the seller of the movie to CSIL, which stated that the gross earnings of the movie in American dollars was $2,700,000 in Italy and $4 million in the rest of the world, excluding the United States and Canada. Dr. Ryder stated that usually the films that are well received abroad are better received in the United States, since the United States is a larger movie market.

The maximum permissible depreciation was discussed at the presentation, and petitioner made a notation on one of the documents distributed at the meeting that of the total amount of permissible depreciation, 96 percent would be deductible in the first 2 years of ownership—85 percent in the first year and 11 percent in the second year. This notation was made on a letter from Mr. Eli J. Warach, who was a vice president-managing editor of Prentice-Hall, Inc. Petitioner regarded this letter as a key factor in his decision to make this investment. The letter, dated January 29, 1974, stated that it was the author's conclusion that Britton Properties was "based upon sound and realistic economic practices and principles" and that "this program is built upon a solid economic and tax foundation."

As he followed along with Dr. Ryder's presentation, while he was utilizing the flip chart as a visual aide, petitioner copied down an entire example from the flip chart on a blank sheet of paper. There were two columns representing the years 1974 and 1975, both of which assumed taxable income of $80,000 and, after subtracting the deductions attributable to the investment, the "tax saving" was listed as $31,360 in 1974 and $10,130 for 1975, the second year of the investment. The next line stated that the tax savings in excess of the cost of investment of $20,000 were $11,360 in the first year and $10,120 in the second year. Below these two columns, petitioner had written a note explaining that if the tax deduction from the investment could not be utilized in the first few years of the investment, a taxpayer was allowed to carry back a loss 3 years and forward 5 years.

On a separate sheet of paper, petitioner also copied a bar graph chart as presented by Dr. Ryder. The chart showed an initial investment of $20,000 and then 3 years of tax savings of $30,490, $8,695, and $4,345, respectively. The next bar above the line on the chart was an illustration made by Dr. Ryder showing that if an investor were to invest the $43,530 in tax savings realized after 3 years in 5-percent tax-exempt bonds, their yield would be $31,900 over the next 9 years. At the end of 12 years, assuming that the picture was unsuccessful, each investor would be subject to recapture in the amount of $33,200. After netting this recapture tax with the tax-exempt income, the chart represented that each investor would make $22,000 on his investment of $20,000, which petitioner regarded as probably less than he could make with $20,000 invested in something else. Thus, it was represented that if an investor were to invest his tax savings in municipal bonds, it was possible for him to come out ahead even if the movie investment was subject to recapture. At the bottom of the page, petitioner wrote that although the life of the movie was indeterminate, the Government would accept a 12-year life, and if the movie made enough to pay off the mortgage, the entire amount, plus or minus $45,000, would be sheltered.

On a cover letter from Hecht, Brayer & Grill, certified public accountants, stating that they had prepared financial projections of the proposed motion picture limited partnerships, petitioner wrote that the typical distribution agreement was as follows: on income of $0 to $500,000, the distributor would receive 70 percent, and the partnership, 30 percent; from $500,000 to $750,000, the distributor would receive 60 percent, and the partnership, 40 percent; and above $750,000, the income would be split 50 percent, each. He also noted that the investment tax credit should have been included in the final investment analysis but was not included in these projections. Dr. Ryder also explained that there were three areas which were subject to change by Congress in the near future: gift taxes, capital gains, and depreciation.

In response to a question from one of the businessmen in the audience, Dr. Ryder explained on the blackboard exactly how the money received from a $2 theater ticket would be allocated. First, the distributor would receive 75 percent, and the theater owner would receive 25 percent. Of the distribu-

tor's 75 percent, it would retain 70 percent and give the partnership 30 percent; and of the partnership's share, 50 percent would be retained by the partnership and 50 percent would be paid to the mortgage holder. Thus, the partnership was to receive $22\frac{1}{2}$ percent of the box office proceeds or $0.45 from a $2 ticket. Of this amount, one-half was to be retained by the partnership, with the remaining one-half paid to the mortgage holder.

In addition to the biographies of Mr. Michael Stern, general partner, Mr. Robert M. Fink, author of the tax opinion letter, and Mr. Lewis S. Ginsburg, president of Stellar IV Film Corp., the distributor of the motion picture, the material presented included a circular describing Britton Properties, together with financial projections assuming various stated gross proceeds. The circular stated that there was to be a $400,000 capital contribution together with a $1,400,000 nonrecourse nonnegotiable promissory note. Petitioner noted that his investment would be $20,000 cash and that his share of the nonrecourse note would be $70,000, for a leverage ratio of 3.5 to 1. The first financial projection, which assumed gross proceeds of $50,000 and a taxpayer in the 50-percent bracket, stated that the total excess of tax savings and cash flow over investment would be $470,500. Assuming gross proceeds of $750,000, the excess of tax savings and cash flow over investment would be $558,400; assuming gross proceeds of $1,500,000, the excess of tax savings and cash flow would be $631,550; and assuming proceeds of $4 million, the excess would be $755,490; and, finally, assuming gross proceeds of $6 million, the excess would be $839,602. The projections also stated that:

The partnership is entitled to retain the first $100,000 of cash, after payment of all Partnership expenses, against recoupment of the cash portion of the purchase price of the film. Thereafter, the Partnership is entitled to retain 60% of such cash with the balance applied to reduce the non-recourse note issued in connection with the purchase of the film.

The projection stated that interest of 4 percent per annum on the outstanding balance was due on the nonrecourse note, which payments were to be made only from cash flow, and all payments were first to be applied to interest.

Publicity material was also distributed at the presentation. This material included a number of still photographs from the

movie and a 1-page summary of the plot. Aside from the limited partnership agreement, none of the other documents which would necessarily be involved in marketing the movie, such as the distribution agreement, the management agreement, the purchase agreement of the movie, and the nonrecourse note, were presented at the investment presentation. No written appraisal of the film was circulated or discussed. Petitioner did not recall any discussion regarding Mr. Ginsburg's background. The successes and failures of Mr. Stern and Mr. Richard H. Friedberg in the movie industry were not discussed although the success of such movies as "Fistful of Dollars" and "Last Picture Show" was mentioned. Petitioner did not conduct any investigation of the principals since he accepted Dr. Ryder's representation that they were knowledgeable people.

The movie was not shown to the potential investors as a part of the presentation. Although petitioner did not personally see the movie until it was broadcast on television from Columbus, Ga., in early 1979, he recalled that the quality of the movie and lead actors was discussed at the meeting.

On March 26, 1974, several weeks after the presentation, petitioner purchased a 4.95-percent interest in Britton Properties through Dr. Ryder. Petitioner paid for his interest with a check for $20,000 which he believes he made out to Britton Properties. His investment was recorded on the books of the partnership and dated April 16, 1974.

The amended limited partnership agreement of Britton Properties which was dated as of January 15, 1974, stated that the partnership constituted a limited partnership under the partnership law of the State of New York. The principal office of the partnership was Suite 2804, 450 Park Avenue, New York, N.Y., which was the office of Mr. Stern, the general partner. The agreement stated that the partnership was formed for the following purposes.

(a) To acquire the United States and Canadian (English language only) rights to a feature motion picture film entitled "BEYOND THE LAW", starring Lee Van Cleef (the "Picture") from Cinema Shares International, Ltd.; and

(b) To distribute, exhibit and exploit the Picture by entering into a distribution agreement (the "Distribution Agreement") with Cinema Shares International Distribution Corp.

The agreement stated that the general partner had contributed $100 to the capital of the partnership and that the maximum aggregate amount of capital to be contributed by the limited partners was to be $400,000. It stated that the capital of the partnership was to be allocated approximately as follows: $50,000 to Cinema Shares International Distribution Corp. (CSID), pursuant to the terms of the distribution agreement; $20,000 for estimated legal and accounting fees and working capital; and the balance to be paid to CSIL for the cash portion of the purchase price of the movie. Profits and losses were to be allocated 99 percent to the limited partners and 1 percent to the general partner. Unless the general partner determined that it was not in the best interest of the partnership, all cash flow was to be distributed at least annually to the limited partners. The general partner was to manage the partnership business and he "shall be the sole representative of the Partnership in all transactions with the third parties."

The general partner could not transfer his partnership interest without the prior written approval of all of the limited partners. Limited partners could not sell any part of their interests until they first made written offers to sell such interests to the general partner and until the consent of the general partner was granted.

Petitioner signed this limited partnership agreement and received a notarized copy at that time.

Mr. Stern did not have an independent written appraisal made of the movie, nor did he know of any other film in which the star of this movie, Lee Van Cleef, had starred as of 1974 which had been a financial success. In an agreement dated "April ___ , 1974," Mr. Stern, as general partner of Britton Properties, entered into a purchase agreement for the movie with CSIL, with offices also located at 450 Park Avenue. CSIL was represented by its president, Mr. Friedberg. Pursuant to the purchase agreement, Britton Properties purchased the motion picture photoplay bearing the title "Beyond the Law" and all of the rights pertaining thereto, for the territory which included the United States and Canada, for the sum of $1,730,000 payable $200,000 on or before June 30, 1974, and $130,000 on or before December 31, 1974, such payments to be made in cash, plus the balance evidenced by a nonrecourse

note for $1,400,000, together with interest at the rate of 4 percent per annum on the outstanding balance. The sole collateral for this nonrecourse note was the film, itself. With respect to the distribution of the film, the purchase agreement provided that the distributor was entitled to no more than 70 percent of the gross receipts from the theatrical exhibitors and that no less than 30 percent was to be remitted directly to Britton Properties. The agreement stated that out of the 30 percent in receipts, Britton Properties was to retain the first $100,000 received and, thereafter, 40 percent was to be paid to CSIL and 60 percent was to be retained by the partnership until the $1,400,000 note plus 4-percent interest on the outstanding balance was paid.

The nonrecourse nonnegotiable promissory note evidencing the $1,400,000 debt provided as follows:

$1,400,000                                                April    , 1974

On December 31, 1985, BRITTON PROPERTIES, a New York Limited Partnership ("Maker"), for value received, hereby promises to pay to CINEMA SHARES INTERNATIONAL, LTD., a New York corporation ("Payee"), the principal sum of $1,400,000 and to pay interest at the rate of 4% per annum on the principal balance from time to time outstanding, such payments of principal and interest to be made at Cinema Shares International, Ltd., 450 Park Avenue, New York, New York 10022 in the manner hereinbelow provided.

Interest and principal shall be payable only out of and to the extent of 40% of "Buyer's Receipts" (hereinafter defined) in excess of $100,000. "Buyer's Receipts" shall mean all amounts actually received by Maker from the exploitation of the motion picture entitled "Beyond the Law", but only to the extent that no third party has any claim to such "Buyer's Receipts".

In the event it becomes necessary to enforce collection of the indebtedness evidenced by this Note, Payee will not institute any legal action against Maker for the payment of any sum of money which is or may be payable under this Note except out of those sums included in the 40% of "Buyer's Receipts" in excess of $100,000 referred to hereinabove.

If Maker shall incur any loss, damage or expense as a result of Payee's breach of any warranty, representation or covenant contained in a certain purchase agreement dated the      day of April, 1974 relating to said motion picture, the amount of any such loss, damage or expense may, at Maker's option, be deducted from the unpaid amount due hereunder as of the date such loss, damage or expense was incurred.

BRITTON PROPERTIES

By (S)Michael Stern

MICHAEL STERN,

*General Partner.*

Mr. Richard Friedberg, as president of CSIL, purchased the movie in 1973 from Pictures & Movies Establishment, a Lichtenstein corporation, represented by Mr. Francis Schertenleib, for the sum of $1,491,250. Of that amount, $91,250 was to be paid in cash on or about December 1, 1973, and the balance of $1,400,000 was evidenced by a nonnegotiable nonrecourse promissory note which contained the exact terms as the note executed by Britton Properties. Also, as with the partnership's note, this note was secured only by the movie. In a letter dated May 10, 1974, Pictures & Movies Establishment stated that the cash portion of the purchase price of the movie was $75,000, so that the total purchase price was $1,475,000 rather than the $1,491,250 as originally agreed upon in the purchase agreement. Mr. Stern did not know the amount of the cash price paid for the film by CSIL although he was an officer in that corporation at that time. He was aware of the amount of the nonrecourse note executed by CSIL but only because it was exactly the same amount as the note executed by Britton Properties in favor of CSIL.

Pursuant to a purchase agreement dated July 20, 1973, Pictures & Movies Establishment purchased the movie "Beyond the Law" from Sancrosiap, an Italian corporation which produced the movie, for distribution in the United States and Canada for the sum of $50,000, $5,000 payable at the closing and $45,000 payable upon receipt of certain materials, such delivery to occur not more than 60 days from the date of the execution of the agreement. The agreement also stated that "The terms of this agreement shall be until December 31, 1985."

In a letter dated November 7, 1973, from Mr. Bruce Balaban to CSIL, Mr. Balaban warranted that if CSIL made a payment pursuant to the purchase agreement entered into prior to November 7, 1973, for the movie "Beyond the Law," he would make sure that Pictures & Movies Establishment and Stellar IV Film Corp. entered into a subdistribution agreement with CSID. The guarantee stated, among other things, that:

WHEREAS Guarantor is aware that, upon entering into said agreement with Seller [Pictures & Movies Establishment], Cinema [CSIL] intends to enter into an agreement with Britton Properties, pursuant to which, among other things, Britton Properties will purchase from Cinema the "Property" purchased by Cinema from Seller * * *

In an agreement dated November 12, 1973, Mr. Richard Friedberg, as president of CSID, and Mr. Lewis Ginsburg, as president of Stellar IV Film Corp. (Stellar IV), agreed that Stellar IV would act as the distributor for the movie "Beyond the Law" until September 30, 1982. The agreement provided that Stellar IV was to expend not less than $50,000 for prints, advertising, and promotion from the date of the agreement through September 30, 1974, and that the movie was to be put in full theatrical release by November 15, 1973. Lewis Ginsburg personally guaranteed the performance of these provisions by Stellar IV. Stellar IV further agreed that the movie was to be played in not less than 100 play dates prior to December 31, 1973. In return for its efforts, Stellar IV was to retain 70 percent of the first $500,000 of gross receipts, 60 percent of the next $250,000, and 50 percent of the balance. Beginning with the calendar quarter ending March 31, 1974, if gross receipts had not aggregated at least $100,000 for any two consecutive calendar quarters, then CSID would have the right to terminate the agreement upon 10 days' notice.

In May 1974, Britton Properties and CSID entered into a distribution agreement for the movie "Beyond the Law." The agreement provided that in return for the payment by Britton Properties of $50,000 cash, plus a percentage of the gross receipts, CSID agreed to devote its best efforts in the distribution and exploitation of the movie. The agreement provided, among other things, that the "distributor agrees that during the period commencing with the date hereof and ending December 31, 1975 there shall be spent no less than a total of $25,000 for prints, promotion, and advertising in connection with" the distribution of the movie. From the gross receipts received by the distributor as film rentals or license fees, CSID was also entitled to 70 percent of the first $500,000, 60 percent of the next $250,000, and 50 percent of the balance of the gross receipts from the theatrical distribution of the movie. Other percentages were listed for gross receipts received from television sales and from the distribution of the movie to the Armed Forces. The agreement was to continue until December 31, 1986, unless the gross receipts did not aggregate at least $50,000 for any two consecutive quarters beginning December 31, 1975, in which event either party had the right to terminate the agreement upon 60 days' notice.

On July 5, 1974, Stellar IV and World Wide Film Distribution Corp. (World Wide) entered into an agreement whereby World Wide agreed to act as the subdistributor of Stellar IV's pictures. The agreement provided that World Wide would retain 65 percent of the gross film rental received from the theaters as its distribution fee. Stellar IV warranted that the agreement was to "run the full length of its own term on these pictures, a minimum of nine years each." At the top of the first page of the agreement, there appeared a handwritten note which stated: "no agreement Cinema Shares—World Wide—."

In May 1974, Britton Properties and Omni Capital Corp. (Omni) entered into a management agreement in which Britton Properties paid Omni $20,000 cash and Omni agreed to provide general and administrative services including legal, auditing and accounting, tax-return preparation and filing, maintenance of books and accounts, and the preparation and mailing of periodic status reports to the partners. Most, if not all, of this information was actually prepared by Mr. Stern. The agreement provided that if the fees and expenses charged by independent third parties for legal, auditing and accounting, and tax-return preparation exceeded $15,000, then Omni would be entitled to reimbursement for such excess amounts from the partnership. The agreement was to remain in effect until December 31, 1986. Omni listed its address as 450 Park Avenue, which was the same address as Britton Properties, and the agreement was signed by Mr. Friedberg, as president of Omni.

Britton Properties consisted of 1 general partner, Mr. Stern, and 24 limited partners. Mr. Stern contributed $100 to the capital of the partnership and his profit-sharing percentage was 1 percent. Of this amount, $10 was paid on April 23, 1974, and the journal entries of the partnership indicate that the $90 balance was received on December 31, 1976. Mr. Stern remained as the general partner until 1979, when he resigned. Of the 24 limited partners, 10 contributed $10,000 for a 2.475-percent share of profits, 13 contributed $20,000 for a 4.95-percent share of profits, and 1 limited partner contributed $40,000 for a 9.9-percent share of profits. Petitioner's close friend, Dr. Sykes, was one of the limited partners who contributed $10,000 to the partnership. The total amount of cash contributed to Britton Properties was $400,100.

Britton Properties supplied petitioner with several sets of play dates, although it has never supplied him with the distribution reports showing the income from these engagements or whether they ultimately played according to schedule. The movie opened at the Red Raider Drive-In in Lubbock, Tex., on July 10 through 16, 1974. It next played at the Angelo Twin Drive-In on July 24 through 30 in San Angelo, Tex., and during that same period at the Park Drive-In, Abilene, Tex. From July 25 through 31 it played at the Skyway Drive-In in Anderson, S.C., and for the period July 25 through 28, it played at the Waco Drive-In in Goldsboro, N.C., and the Valley Drive-In in Elkin, N.C. For the months of July through September 1974, the film played only in Texas, South Carolina, and North Carolina. However, there were also 12 "combination showings" in Louisiana, South Carolina, North Carolina, and Mississippi during August through early October. In a letter dated October 1, 1974, Michael Stern reported that Stellar IV, the distributor of the movie, reported four bookings in October, three in November, and two in December. On a separate sheet of paper, two more bookings were reported in November in South Carolina and four in California in December. In all, there were 54 dates listed on the various sheets of paper for 1974; however, there was no independent confirmation that the movie in fact played in all of these locations during the stated dates. There were 14 play dates in March 1975, 6 in April, 14 in May, 36 in June, 12 in July, 41 in August, 32 in September, and 5 in October, for a total of 160. There were two theatrical play dates in 1976, both of which occurred in March.

At some time in late 1974, after the poor opening of the film, Mr. Stern and Omni Capital became concerned that the independent distributor, Stellar IV, was not properly distributing the film. They subsequently learned that Stellar IV had entered into a subdistribution agreement with World Wide without the approval of CSID and that Stellar IV was generally an undercapitalized company. In a letter dated December 6, 1974, Mr. Friedberg, on behalf of CSID, notified Stellar IV that the distribution agreement dated November 12, 1973, would terminate 15 days after receipt of the letter, unless it could show that all of the terms of the agreement had in fact been complied with. In a letter dated January 6, 1975, Mr. Friedberg stated that the agreement was terminated. In a

memorandum to the limited partners dated April 3, 1975, Mr. Stern stated that:

Shortly after my letter of October 1, 1974, I found that several of the playdates sent to me by Stellar IV Film Corp. were not promoted in accordance with what I consider sound theatrical policy. As a result, I have changed our distribution affiliation to World Wide Films, Inc., which will be distributing the film for 1975.

Mr. Stern did not inform the limited partners that Stellar IV had previously entered into a subdistribution agreement with World Wide. World Wide continued its distribution of the movie in 1975, and the last distribution report submitted by it was dated November 25, 1975. CSID assumed full responsibility for the distribution of the movie on January 1, 1976.

In a letter to Mr. Stern dated July 10, 1975, petitioner asked for a list of the play dates and "any comments you might have about the income from the film under the new distributor." In response, Mr. Stern wrote on July 16, 1975, "I just received the report from the distributor and am in the process of compiling the list for the limited partners" and that the play date report would be forthcoming. This report was later sent to the limited partners and dated July 21, 1975.

In the fall of 1975, petitioner realized that the period had arrived in which the movie should begin to be successful. Since he had not received any return on his investment, he decided to check on the progress of the movie by selecting a few of the play dates and calling four or five theaters around the country. The persons he reached at the first two or three theaters that he called told him that they had never heard of the movie "Beyond the Law." Then he contacted a theater in Brownsville, Tex., and received the reply that although it was not a huge success, the movie was doing pretty well and quite a few middle-aged people were coming in to see it. At that point, he was very concerned and called Mr. Stern to advise him of these discrepancies in distribution. Petitioner confirmed these efforts in a letter to Mr. Stern dated April 16, 1976, in which he stated that his notes indicated he had called two theaters in Arkansas and two in Texas. Petitioner commented, "I believe we scored at the Majestic, this being the only one where the ticket office had heard of our movie." He also stated "perhaps it would be good to make some current calls before we take any action; my records would not look very impressive in court."

Petitioner never received any written reply from Mr. Stern concerning this letter. A letter to Mr. Stern dated December 8, 1976, from petitioner read as follows:

Dear Mr. Stern:

My tax advisor has asked that I check with you about taking my third-year loss on "Beyond the Law". We are uncertain about the new tax laws.

I would also appreciate your comment on the performance of our distributor this year (see my letter of April 16).

Also, I failed to receive a list of play dates for 1976, and would still like to see this.

Finally, my tax investigation, pending for over a year, has still not been wrapped up. How are other tax audits turning out?

I would be pleased to hear from you before the end of the year, if at all possible.

In a letter dated December 10, 1976, to petitioner, Mr. Stern stated that he had enclosed "a copy of the Producer's Report for the period January 1 thru June 30, 1976 and a list of playdates that was sent to the partnership by the distributor." This report, from CSID, stated that for the first 6 months of 1976, $1,175 in net film rental had been collected and the partnership's 30-percent share amounted to $352.50. The play date schedule indicated that there were only two showings of the film in 1976. Petitioner wrote on the schedule "Is this it for 1976? Short year!", signed it and sent it back to Mr. Stern, but he never received any reply.

In a letter dated April 1, 1977, Mr. Mel Maron, of CSID, wrote Mr. Stern: "the film entitled BEYOND THE LAW has done very poorly and westerns seem to be having a tough go. We are trying to secure as many playdates as possible theatrically, however, we are limited as this picture is starting to play on television." At this time, CSID was beginning to obtain contracts for the movie from various television stations. After petitioner received some of these play dates, instead of calling, he wrote a letter dated July 28, 1977, to an Atlanta, Ga., television station inquiring as to when the movie would be shown. Petitioner received a letter dated August 1, 1977, from the station indicating that the movie was not under contract to that station. He then promptly contacted Mr. Stern by letter dated August 2, 1977, and petitioner received a letter dated August 8, 1977, from the film director of the TV station stating that, in fact, they were licensed to exhibit the movie and that it was televised on January 14, 1977, on their Friday night late

movie. Petitioner made a similar inquiry of a TV station in Columbus, Ga., in early 1979 and received a letter dated March 15, 1979, that the station did own the rights to the movie and that it was scheduled to play on April 29, 1979, at 12:30 p.m.

In selling the movie "Beyond the Law" to the television stations, CSID prepared a movie package consisting of 23 feature films, including "Beyond the Law." These packages were then sold to the television stations beginning in early 1976. The term of the contract ranged from approximately 4 to 7 years. A schedule prepared for Britton Properties of the TV income from these contracts indicated that the movie had been sold to 36 television stations up to December 31, 1979. The total contract price allocable to the movie was $40,197.92, and the cash received up to December 31, 1979, was $34,783.92.

On its return, Britton Properties reported that it acquired the movie in April 1974 and claimed a depreciable basis of $1,730,000. The partnership reported the following amounts of income and deductions for the stated years:

|  | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 |
|---|---|---|---|---|---|---|
| TOTAL INCOME | $1,500 | $679 | $1,712 | $1,793 | NA | $5,700 |
| Less: | | | | | | |
| Depreciation | 1,162,560 | 318,874 | 112,934 | 52,920 | | 4,552 |
| Other deductions[1] | 70,003 | --- | --- | --- | | --- |
| INCOME (loss) | (1,231,063) | (318,195) | (111,222) | (51,127) | | 1,148 |

[1]Distribution expenses, $50,000; management fees, $20,000; bank charges, $3.

The partnership computed the allowable depreciation each year under the income forecast method authorized for motion pictures under Rev. Rul. 60–358, 1960–2 C.B. 68. Pursuant to this method, the partnership estimated at the end of the taxable year 1974 that the movie, over its useful life, would produce total income of $2,143. As the movie actually produced income of $1,500 for 1974, the fraction of actual income over forecast income equaled 70 percent ($1,500 over $2,143). Based on the foregoing, the partnership claimed 70 percent of the depreciable basis of the movie (cost less salvage) of $1,660,800 or $1,162,560 as depreciation in 1974. The depreciation for 2 out of the next 3 years was determined according to the following formula:

$$\frac{\text{Actual year's income}}{\text{Revised estimated income}} \times \text{Remaining basis} = \text{Year's depreciation deduction}$$

The actual computations as reported on the returns were as follows:

1975   $\dfrac{\$678.94}{\$1,208.29} \times \$567,440 = \$318,874$—Depreciation expense

1976   $\dfrac{\$10,100}{\$10,500} \times \$1,660,800 = \$1,594,368$

Less   $\$1,481,434$—Depreciation to date

$\$112,934$—Depreciation expense

1977   $\dfrac{\$3,983}{\$5,000} \times \$66,432 = \$52,920$—Depreciation expense

Britton Properties made the following cash disbursements to its partners and the stated organizations for the years indicated:

| Year | CSIL | CSID | Omni | Distribution to partners | Bank |
|------|------|------|------|--------------------------|------|
| 1974 | $302,500 | $50,000 | 0 | 0 | $227.39 |
| 1975 | 46,500 | 0 | 0 | 0 | 0 |
| 1976 | 0 | 0 | 0 | $2,185.04 | 0 |
| 1977 | 0 | 0 | 0 | 1,722.00 | 0 |
| 1978 | 0 | 0 | 0 | 0 | 0 |
| 1979 | 0 | 0 | $1,000 | 0 | 0 |
| | 349,000 | 50,000 | 1,000 | 3,907.04 | 227.39 |

Due to the unsuccessful box office performance of the movie, Britton Properties had not made any payments of either interest or principal on the nonrecourse note held by CSIL at the time of trial. Similarly, no payments had been made by CSIL on the identical nonrecourse note held by Pictures & Movies Establishment.

Mr. Stern worked in the tax department of a large accounting firm for 6 years as a C.P.A., and worked as an investment banker for approximately 5 years thereafter. He also was a lawyer in New York. He received a master's degree in business administration from the Tuck School at Dartmouth College. While he was an investment banker, he participated in a number of underwritings for some very large companies including acquisitions and private placements. Mr. Friedberg

graduated from Boston University, and from 1961 through 1964 he started and operated a company called "Image Makers," which was a theatrical management firm. From 1964 to 1970, he was associated with a company called "Premier Talent Associates," which acted as a booking agent for musical groups. From 1969 to 1971 or 1972, he was associated with EYR Programs, which was involved in the distribution of films to colleges and universities. He had initially paid in $45,000 to EYR Programs, and his interest was purchased by the company, at a loss, in 1971 or 1972. From 1972 to 1973, he worked as a consultant for Bernard Aronson, a New York Stock Exchange brokerage firm. It was while working with Mr. Aronson that Mr. Friedberg met Mr. Stern. In March 1973, the firm asked Mr. Friedberg and Mr. Stern to leave the offices of Bernard Aronson, and they moved to 450 Park Avenue.

CSIL was formed in February 1971; CSID was formed in April 1972; and Omni was formed in April 1973. As of April 1972, Mr. Friedberg was the sole shareholder of CSIL. In 1974, Mr. Friedberg was the president of CSID, CSIL, and Omni. In 1974, Mr. Stern was the vice president of CSIL, CSID, and Omni. In 1974, Mr. Stern was paid by CSIL. In 1976 or 1977, Mr. Stern acquired a 20-percent ownership interest in CSID, but he did not have any ownership interest prior to that time. In 1974, all of these companies were located on the 28th floor of a building located at 450 Park Avenue in New York City. In early 1974, the companies were all located in one office, but in late 1974 or early 1975, were expanded into two sets of offices.

In 1974, Mr. Stern and Mr. Friedberg worked together in the formation of various types of investments, including motion pictures, private placements, and mergers and acquisitions. More specifically, they participated in the formation of 20 limited partnerships which invested in motion pictures. CSIL paid the salesmen their commissions on the sale of the partnership interests and also paid Mr. Greene, who drafted the partnership documents, and Mr. Fink, who rendered the legal opinions on many, if not most, of these partnerships. All of these 20 motion picture partnerships had the same mailing address, 450 Park Avenue, and Mr. Stern helped to operate all of them as part of his duties. Of these 20 limited partnerships, 19 purchased their film from CSIL. Out of the 19, 18 paid CSIL

with cash, plus a large nonrecourse note with interest of either 4 or 6 percent. The other limited partnership purchased its film from Louisiana Film Shares, Inc., a corporation, located at 450 Park Avenue, of which Mr. Stern was an officer. Omni also had a management contract with each of these limited partnerships and part of its duties included the preparation of their tax returns. In this regard, Omni contracted with certain accounting firms to prepare the returns after Mr. Stern gathered all of the relevant information and presented it to the accountants. Of the 20 limited partnerships, 19 had distribution agreements with CSID. Three of these agreements stated that CSID was to be compensated on a percentage basis, and the remaining 16 agreements provided for a flat distribution fee, ranging from $40,000 to $100,000 which would be paid in advance, and a percentage basis of compensation. During the years 1974 through 1977, none of these 20 limited partnerships reported any taxable income, although some of the partnerships did begin to report taxable income, thereafter, due to a decline in the amount of their depreciation deductions. However, none of them earned an amount in excess of the cash paid in by the partners for the purchase of their partnership interests.

Dr. Ryder, who made the presentation of the movie investment to petitioner, began selling these movie investments for CSIL in early 1970 while he was a practicing psychiatrist in Atlanta, Ga. He received his training from Mr. Friedberg, and all the materials he used in his presentations were supplied by CSIL. He was paid a commission of 10 percent, which was later raised to 15 percent. These commissions were paid to him by CSIL, and he received commission checks of about $230,000 in 1973 and about $300,000 in 1974. During this period, he visited Mr. Stern and Mr. Friedberg at their offices in New York on several occasions, the first being sometime before 1973. Dr. Ryder was aware of Mr. Stern's and Mr. Friedberg's relationship with CSIL, CSID, and Omni. In his presentation, he generally did not discuss the relationship between these individuals and companies. However, the potential investors in the audience did, as a rule, ask about the various relationships, and he discussed them at that time. In the sale of the Britton Properties partnership interests, he might have disclosed the relationship of Mr. Stern with the other companies

because Mr. Stern was the general partner of that limited partnership; however, he did not recall specifically naming Mr. Stern as the person filling those positions. Dr. Ryder did view the movie in New York City prior to his presentation. Although film viewings were offered to the investors of Britton Properties at the presentation, none of them took advantage of that opportunity.

The movie "Beyond the Law" was a western filmed in Italy starring Lee Van Cleef, Lionel Stander, and Bud Spencer, with music by Riz Ortolani and directed by Giorgio Stegani. Lee Van Cleef plays Cudlip, a bad guy who turns good guy who turns back again to bad guy. This film, which was made in Italy, was known in the trade as a "spaghetti western" due to the large number of Italian westerns distributed in the United States during the late 1960's and early 1970's. The three principal actors spoke English, while the balance of the cast was made up mostly of Italian and German actors. In order to prepare this film for the American market, the producers had to use two separate processes. First, they deleted all of the sound, and then the English actors post-synchronized their voices; that is, they tried to match what they said on the screen with their voices, without any other sound effects or live background noise. With the non-English-speaking actors, the producers had to dub in their voices and match the mouth movements on the screen as best they could with the new English voices. This post-synchronization job was not done very well, as the mouth movements on the screen did not match the dialogue throughout the film. In addition, the editing of the film was poor. There were lapses in the story, and the music and sound effects from one scene often overlapped into the next, due to the large number of cuts which had been made in the print. These editing problems could have happened in the laboratory process and thus have affected only some of the prints. However, the overall synchronization problems can be readily identified by an expert, and television buyers are quite critical about this particular aspect of production.

In order for a film to be protected by a U.S. copyright, a "c" with a circle around it must appear on each film print, itself. There was no such marking on the only print of the film viewed by the experts who testified in this case. A certificate from the copyright office of the United States of America

stated that there was no separate registration for this particular motion picture for the period 1971 through January 11, 1980.

The producer's report No. 12 from CSID for the 6-month period ended June 30, 1980, for the movie "Beyond the Law" read as follows:

|  | This period | Cumulative to: 6/30/80 |
|---|---|---|
| GROSS RECEIPTS: | | |
| U.S. and Canadian theatrical film rental .......... | $80.00 | $9,166.02 |
| Less: Cooperative and advertising .................... | 0 | 1,258.87 |
| Theatrical gross receipts ............................... | 80.00 | 7,907.15 |
| Television syndication gross receipts................. | 1,268.48 | 35,176.72 |
| Nontheatrical ........................................... | 50.00 | 4,070.00 |
| Total gross receipts (all sources) .................... | 1,398.48 | 47,153.87 |
| DISTRIBUTION FEES: | | |
| Theatrical (60 percent) ................................ | 48.00 | 5,527.00 |
| Television syndication (35 percent) .................. | 443.97 | 12,311.85 |
| Nontheatrical (50 percent) ............................ | 25.00 | 2,035.00 |
| Total distribution fees ................................. | 516.97 | 19,873.85 |
| Gross receipts less distribution fees ................. | 881.51 | 27,280.02 |
| Less: Television expenses | | |
|     Prints ............................................. | 600.00 | 3,600.00 |
|     Brochures ......................................... | | 1,100.00 |
|     E & O insurance .................................... | | 400.00 |
|     Editing (CRI) ...................................... | | 5,000.00 |
| Total television expenses .............................. | 600.00 | 10,100.00 |
| Producer's share of the gross receipts (buyer's).... | 281.51 | 17,180.02 |
| Less: Amount previously paid .......................... | | 3,890.79 |
| Amount now due ....................................... | | 13,289.23 |

Petitioner received a check from Britton Properties dated March 3, 1976, in the amount of $108.16 as a partnership distribution. He also received a distribution from the partnership in the amount of $84.74 on March 31, 1977.

On his return for the calendar year 1974, petitioner claimed that his adjusted basis in his partnership interest was $85,635 and that the property had a useful life of 3 to 5 years. On this basis, petitioner claimed an investment credit of $1,998.15, and he claimed a loss from the partnership of $60,938.[1] On his

---

[1] The record shows that an investigation of petitioner's 1974 Federal income tax return was begun in 1975. The record further shows that in the spring of 1978 this investigation was not completed and, at the request of an agent of respondent, petitioner signed a Form

return for the calendar year 1975, petitioner claimed a loss from Britton Properties of $15,751. Similarly, he claimed a loss of $5,505 for the calendar year 1976, $2,531 in 1977, and $66 in the calendar year 1978.

In his notice of deficiency, respondent determined that petitioner's reported loss of $15,751 for the calendar year 1975 was not allowable since the partnership's claimed deduction for depreciation was disallowed. As Britton Properties reported gross taxable income of $679, petitioner's 4.95 percent of that figure was $34 and therefore his taxable income was increased in the amount of $15,785. In addition to his determination that the entire partnership loss was not allowable because the film was not an activity engaged in for profit within the meaning of section 183,[2] that it was not used in carrying on a trade or business within the meaning of section 162, and that it was not held for the production of income within the meaning of section 212, respondent made the following explanation:

> The amount of $318,874.00 claimed as the deduction for depreciation expense attributable to the film known as "Beyond The Law" is disallowed because the nonrecourse loan relative to its acquisition lacks economic substance and the amount of the loan cannot be added to the depreciable basis of the film. Furthermore, the fair market value of the film has not been established and therefore, the loan to which the film is subject cannot be considered as the partnership liability and cannot be included in the partners' basis. Furthermore, it is determined that the partnership's method of depreciation does not bear a proper relationship to a decline in the film's usefulness. In any event, it is determined that the basis of the motion picture, for depreciation purposes, is limited to the fair market value of the film at the date of its acquisition.

## OPINION

The only issue for our determination is whether petitioner is entitled to deduct, in 1975, a loss from his partnership interest in Britton Properties. Respondent contends that petitioner is

---

872 waiver extending the time for assessment and collection of tax to Oct. 31, 1979. The record further shows that on June 8, 1979, petitioner was mailed a letter requesting that he sign a Form 872 further extending the statute of limitations for assessment and collection of his 1974 income tax. Since the notice of deficiency in the instant case was mailed on Apr. 13, 1979, the clear inference from the record is that petitioner has not been allowed the loss he claimed from the Britton Properties partnership for the year 1974.

[2]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.

not entitled to such a loss deduction because (1) the amount of the nonrecourse indebtedness should not be included in the basis of petitioner's partnership interest, and (2) in any event, the deductibility of the loss in 1975 is limited to the extent provided under section 183 because the purchase and subsequent distribution of the movie was an activity "not engaged in for profit." Petitioner contends that he is entitled to the loss claimed on his return for 1975.

Section 167(g) provides that the basis of depreciable property is the adjusted basis provided in section 1011. Section 1011 provides that in determining the gain or loss from the sale or other disposition of property, the basis of such property, as provided in section 1012, is its cost. Where property is acquired by purchase, generally its cost includes the amount of liabilities assumed or taken subject to by the purchaser. *Crane v. Commissioner*, 331 U.S. 1 (1947); *Parker v. Delaney*, 186 F.2d 455 (1st Cir. 1950); *Blackstone Theater Co. v. Commissioner*, 12 T.C. 801, 804 (1949). The mere fact that the liability is secured only by the asset transferred and the purchaser otherwise has no personal liability, will not, in and of itself, prevent such liability from being included in the basis of the property. *Mayerson v. Commissioner*, 47 T.C. 340 (1966).

While it is clear from the above analysis that a nonrecourse note can be included in the cost basis of an asset, it is well settled that depreciation is based, not on mere legal title, but on actual investment in the property. *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981); *Mayerson v. Commissioner, supra* at 350. No such actual investment will exist to the extent of the amount of the nonrecourse note where the stated purchase price of the property securing the note exceeds a reasonable estimate of its existing fair market value since the purchaser would be acquiring no equity in the property by making payments and, therefore, would have no economic incentive to pay off the note.[3] *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hager v. Commissioner*, 76 T.C. 759, 774–775 (1981); cf. *Beck v. Commissioner*, 74 T.C. 1534, 1562 (1980), on appeal (9th Cir., Jan. 22, 1981).

---

[3]We do not have before us a case where the cash paid for the property was less than its fair market value.

In *Estate of Franklin,* a limited partnership purchased a motel for $1,224,000. The purchase price was to be paid over a 10-year period through small monthly principal and interest payments together with a large balloon payment of the difference at the end of that period. The purchase obligation was nonrecourse and apart from $75,000 paid as prepaid interest, no cash exchanged hands as the parties had entered into a leaseback, which payments approximated the stated monthly payments provided for under the purchase agreement. Since the lease was on a net basis, the sellers remained responsible for all of the operating expenses, and they remained responsible for the first and second mortgages until the balloon payment was made. In concluding that the partnership was not entitled to the depreciation deductions generated by the property, the Ninth Circuit stated that the fatal defect in this arrangement was the fact that the taxpayers failed to establish that the "purchase price was at least approximately equivalent to the fair market value of the property." The court reasoned that where the purchase price exceeds "a demonstrably reasonable estimate of the fair market value" of the property, "payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value." *Estate of Franklin v. Commissioner, supra* at 1048. Accordingly, the partnership could not depreciate the motel as it did not have any real investment in the property.

We have expressly adopted the *Estate of Franklin* analysis. In *Narver v. Commissioner, supra,* two partnerships, in a transaction that was not at arm's length, purchased a building with no cash down and a nonrecourse debt in an amount which was substantially in excess of the building's fair market value. We concluded that because the purchase price was "so far in excess of the value" of the building, the taxpayers did not possess an equity interest in the building nor did they incur a genuine indebtedness in favor of the seller. *Narver v. Commissioner, supra* at 98. In reliance upon *Estate of Franklin,* we held that the taxpayers were not entitled to their claimed depreciation deductions to the extent that such deductions were attributable to the amount of basis represented by the nonrecourse note.

In the instant case, respondent argues that petitioner is not

entitled to his share of the partnership loss generated by the depreciation deductions reported by the partnership to the extent that such deductions are attributable to the nonrecourse note. Thus, in order for petitioner to prevail, it is incumbent upon him to establish that the fair market value of the movie reasonably approximated its purchase price.

At trial, petitioner did not present any expert witnesses to independently establish the fair market value of the movie. Rather, petitioner resorts to a number of legal arguments on brief which he believes support his position that the full amount of the nonrecourse note must be included in the basis of the movie. In essence, petitioner argues that the note must be included in basis in order to preserve the symmetrical balance provided for in the case law and in the Internal Revenue Code; that is, that since a debt will be included as an amount realized upon disposition, it should also be included in the initial cost basis of an asset. See secs. 1011 and 1012; *Crane v. Commissioner, supra.* If this policy is not maintained, petitioner foresees a situation in which respondent will receive the best of all possible results at both ends of a transaction. A nonrecourse note will be excluded from a taxpayer's initial basis, thus reducing the amount of depreciation deductions to which a taxpayer is entitled over the useful life of the property, while the full amount of the debt will be included in the amount realized upon disposition of the property, thus increasing the amount of gain realized.

In support of his position, petitioner relies heavily upon our decision in *Brountas v. Commissioner*, 73 T.C. 491 (1979). In *Brountas*, the taxpayers were involved as investors in a number of drilling ventures. The ventures purchased an interest in a leasehold and drilling contract for a cash price of 40 percent of the total price of the leasehold and drilling contract, and then executed a nonrecourse note for the remaining 60 percent, which note was payable solely from production. Insofar as it is relevant to the instant case, we held that the nonrecourse notes were not shams and that for tax purposes the notes were to be regarded as production payments as provided in section 636. Therefore, we concluded that the notes were to be treated as liabilities which increased petitioners' bases in their partnership interests by the full face amount of the nonrecourse notes. In his brief, petitioner

correctly points out that we recognized the principle of "symmetry" in *Brountas* when we stated that:

[In *Crane v. Commissioner*, 331 U.S. 1 (1947)] the Supreme Court held that the amount of a nonrecourse mortgage is included in the owner's basis and in the amount realized upon disposition of the property. The *Crane* doctrine is basically a symmetrical one—a taxpayer includes nonrecourse liabilities in his basis, but he must also include such liabilities in the amount he realizes upon disposition of the encumbered property. * * * [*Brountas v. Commissioner, supra* at 573–574. Fn. ref. omitted.]

However, petitioner's argument on brief, that "the *Brountas* Court rejected the notion that in order to establish the basis of property acquired with non-recourse financing the taxpayer must establish the value of the property," and his belief, that all nonrecourse debt *automatically* must be included in basis at its face amount, are without foundation.

While we adopted the symmetry inherent in the *Crane* doctrine of inclusion of liabilities, upon acquisition, and inclusion, upon disposition of an asset, in *Brountas*, this by no means leads to the conclusion that *all* purported debt is *automatically* added to a taxpayer's basis. Rather, as we have stated above, a taxpayer must first establish that a valid debt exists. In this regard, our conclusion in *Brountas* must not be read as a broad doctrine which exists outside of the factual circumstances of that case. Specifically, we only held that "For all purposes of tax law, even an interest which is not objectively a debt must be treated as a debt if it is described in section 636." *Brountas v. Commissioner, supra* at 570. In fact, we expressly recognized the limited scope of our opinion when we stated that:

Leaving aside for the moment the provisions of section 636, we would consider it highly doubtful that a pre-drilling production payment on an exploratory or so-called wildcat well, even when cross-collateralized with other wildcat wells or any similar nonrecourse, highly contingent obligation would be a "liability" for purposes of section 752(a). * * * [73 T.C. at 559.]

As we are presented herein with a nonrecourse note secured only by a movie, and not a production payment carved out of mineral property, we would have to conclude that a valid debt exists in order to include the amount thereof in the basis of the property for the purpose of computing depreciation. In order to determine whether a valid debt exists, it is necessary to decide

whether the fair market value of the movie reasonably approximated its purchase price.[4] As we have noted above, petitioner did not present any expert witnesses at trial to establish the value of the movie. The deficiency notice plainly stated that the fair market value of the movie had not been established and in this regard, the burden of proof is upon petitioner. *Welch v. Helvering*, 290 U.S. 111 (1933). However, petitioner, in the alternative, also argues on brief that if we do not accept his reading of *Brountas*, then he relies upon the fact that a motion picture is a very speculative investment, that an evaluation of a motion picture is very difficult as it depends almost entirely upon an individual's taste, and that the best evidence of the fair market value of the movie is what a willing buyer, Britton Properties, paid a willing seller, CSIL.

Based on all of the evidence presented, we conclude that petitioner has not sustained his burden of establishing that the fair market value of the movie was equal to, or reasonably approximated, its purchase price. First, respondent presented four expert witnesses, two of whom estimated the value of the movie to be zero. The other two estimated its value at $60,500 and $75,000 to $85,000, respectively. Without determining the exact value of the movie, we conclude from the testimony of these experts and the other evidence of record that the value of the movie, "Beyond the Law," when it was acquired in 1974 by Britton Properties was between $60,000 and $85,000.

An important factor in our determination of an approximate value of the movie is the cash price paid in the two prior sales of the movie. See *Narver v. Commissioner*, 75 T.C. 53, 96–97 (1980). This record shows that, in July 1973, Pictures & Movies Establishment purchased the movie from Sancrosiap for a total consideration of $50,000. CSIL then purchased the movie from Pictures & Movies Establishment for $91,250 plus the nonnegotiable nonrecourse promissory note of $1,400,000; however, the cash portion of the purchase price was later reduced to $75,000 by a letter dated May 10, 1974.

Other facts which indicate that the fair market value of the

---

[4]We believe that petitioner's concern, that the symmetry of the *Crane* doctrine (*Crane v. Commissioner*, 331 U.S. 1 (1947)) will be violated, is alleviated in our analysis because if we conclude that there is no valid debt to include in basis upon acquisition, then, absent a change in circumstances, there will be no debt to add to the amount realized upon disposition.

movie was not anywhere near the purchase price paid by Britton Properties are that Mr. Stern, the general partner and also the officer of Omni who was in charge of preparing all of the information so that the partnership tax returns could be completed, estimated that the total income to be derived from the movie over its useful life, revised as of the end of the taxable years 1974 through 1977, would be $2,143, $1,208.29, $10,500, and $5,000, respectively. Based on his own annual yearend projections, it is difficult for us to believe that a movie which was purchased for $1,730,000 in April could decline so far in 8 months that the estimated total income to be realized over the useful life of that movie would be only $2,143. Clearly, this difference cannot be attributed to a "bad bargain" on the part of Britton Properties. See *Estate of Franklin*, 544 F.2d at 1049.

Petitioner contends that the fair market value of the movie was in fact its purchase price, as that was the amount agreed upon between a willing buyer and a willing seller, with neither party acting under compulsion and both parties' being fully informed of all relevant facts. *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979). This definition assumes that the buyer and seller will have adverse economic interests. *Narver v. Commissioner, supra* at 96. However, in the instant case, Mr. Stern was both the general partner of the buyer, Britton Properties, and an officer of CSIL, the seller. In addition, this relationship was not specifically brought to the attention of many, if not all, of the partners of Britton Properties and the legal opinion letter written by Mr. Fink even stated that CSIL "is not related to the General Partner nor the Limited Partners of the Partnership." As a final indication of value, we note that the same collateral, the movie, was the sole security for the separate nonrecourse debts between Britton Properties and CSIL and between CSIL and Pictures & Movies Establishment.

Based upon all of the evidence, we conclude that the fair market value of the movie did not equal the cash price of $330,000 paid by Britton Properties, much less approach the total purchase price of $1,730,000 composed of this cash price and the nonrecourse note of $1,400,000. Accordingly, as the $1,400,000 nonrecourse note was secured by property of a value not in excess of $85,000, the partnership never had an

actual investment in the nonrecourse note as it would have no economic incentive to pay off the note. In fact, no payments were ever made of principal and/or interest on either the note from Britton Properties to CSIL or the note from CSIL to Pictures & Movies Establishment. As a result, petitioner is not entitled to deduct any part of the depreciation claimed by the partnership which is attributable to the increase in basis of $1,400,000, the face amount of the nonrecourse note.[5]

The next issue presented is whether petitioner is entitled to any of the claimed deductions which were attributable to the $330,000 in cash paid by the partnership for the movie. Respondent contends that these deductions should be allowed only to the extent provided in section 183. Section 183(a) provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."[6] If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those

---

[5]Respondent argued on brief that the nonrecourse note should be excluded from basis because the terms of repayment indicate that the debt is too contingent. Respondent also urged us to exclude the note on the grounds that it is a sham. However, as we have excluded the note on the basis of fair market value, we need not reach these two alternative arguments raised by respondent.

[6]Sec. 183(a) through (c) reads as follows:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1).

On many occasions in the past, the issue has been characterized, as it has been herein by respondent and petitioner, as whether the activity was engaged in for profit within the meaning of section 183. However, section 183 operates only where the activity is *not* engaged in for profit, which phrase is defined in section 183(c) to mean an activity for which deductions under section 162 or 212(1) or (2) are not allowable. Thus, by its express terms, section 183 is not a disallowance provision, but rather takes effect when the taxpayer is engaged in an activity in which he is not otherwise entitled to his claimed deductions under section 162 or 212, and allows those deductions to the extent provided in section 183(b). See sec. 1.183–2(a), Income Tax Regs. This view of section 183 as an allowance provision better explains its position in the Internal Revenue Code under subtitle A, chapter 1, subchapter B, part VI, entitled "Itemized Deductions for Individuals and Corporations." Therefore, before we can apply section 183, we must first determine whether the deductions from the activity are allowable under section 162 or 212.

Petitioner was a limited partner in Britton Properties, which was organized as a limited partnership under New York law. With the cash contributed by the limited partners, the general partner purchased the rights to a movie for a total price of $1,730,000, consisting of $330,000 cash and a nonrecourse note for $1,400,000. In its initial return of income for the year 1974, the partnership claimed a depreciable basis for the movie of $1,730,000 and a deduction for depreciation of $1,162,560. It reported a partnership loss for the year 1974 of $1,231,063. In 1975, the year here in issue, the partnership claimed a depreciation deduction of $318,874 on its return of income and reported a loss of $318,195 which was due solely to the claimed depreciation deduction. Petitioner, on his return for each of the years 1974 and 1975, deducted his 4.95-percent distributive share of the loss reported by the partnership. The issue for the year here involved, 1975, is whether petitioner is

entitled to deduct this claimed partnership loss. In order to be entitled to deduct the claimed partnership loss, petitioner must show that the partnership properly computed its depreciation deduction in 1975.

Section 167(a)[7] provides for a deduction for depreciation with respect to property used in a trade or business or held for the production of income. It is petitioner's position that the movie was property used in the trade or business of the partnership. It is respondent's position that the partnership was not engaged in a trade or business since the partnership did not own and distribute the movie with the motive or intent to make a profit.

It is well settled, that in order to constitute the carrying on of a trade or business under section 162(a),[8] the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. See also *Hager v. Commissioner*, 76 T.C. 759, 784 (1981); *Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). On this issue of profit motive, petitioner and respondent initially disagree as to whether the profit motive analysis should be made at the partnership or

---

[7]Sec. 167(a) provides as follows:

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

The words "trade or business" in sec. 167(a) have been interpreted in a manner consistent with those same words used in sec. 162(a). See *Richmond Television Corp. v. United States*, 345 F.2d 901, 909 (4th Cir. 1965), remanded on other grounds 382 U.S. 68 (1965). Neither party contends that the movie was property held for the production of income under sec. 212. As petitioner claimed in both 1974 and 1975 his pro rata share of the loss reported on the partnership return of income rather than separately accounting for his share of the depreciation expense as provided in sec. 1.702–1(a)(8)(i), Income Tax Regs., it is apparent that petitioner and the partnership regarded the movie as "property used in a trade or business." Since neither party contends that the movie was property held "for the production of income" under sec. 212, we do not consider such an issue to be present in this case and therefore will not consider any such issue.

[8]Sec. 162(a) provides in part as follows:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *

partner level. Essentially, petitioner argues that the question of intent should not be determined at the partnership level because a partnership is an organization consisting of individuals who may possess as many differing investment objectives as there are partners.[9] Thus, the Court would be faced with the problem of trying to determine one identifiable "intent" out of the numerous investment goals, which intent would not necessarily reflect the actual intent of that particular taxpayer. On the other hand, respondent makes a number of arguments based on the statutory and case law in support of his position that the question of profit motive should be analyzed at the partnership level.

We have previously addressed the issue of whether the trade or business requirement of section 162(a) must be applied at the partner or partnership level. In *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 564–565 (1979), affd. 633 F.2d 512 (7th Cir. 1980), we held that a joint venture, composed of three utility companies, could not deduct certain costs incurred in preparing a nuclear power plant for operation since the costs were "start-up" costs of the joint venture. In so holding, we concluded that whether the expenses were incurred in carrying on a trade or business within the meaning of section 162(a) must be resolved at the partnership level. In reaching our conclusion, we refused to attribute the prior business activities of the partners to the partnership.[10]

Recently, we reaffirmed our position in *Madison Gas & Electric Co.* in *Goodwin v. Commissioner*, 75 T.C. 424, 434–439 (1980). *Goodwin* involved the claimed deduction by two limited partnerships of certain loan and mortgage broker fees paid to secure permanent financing for the construction of a housing

---

[9]Petitioner does not argue that he was personally engaged in the business of distribution of the movie, but contends that he is entitled to deduct his distributive share of the partnership loss since he made his investment in the partnership with a profit motive. It should be pointed out that petitioner is not claiming a deduction of a loss on his investment in his limited partnership interest. If in some other year he claims such a loss, the question of whether he made his investment with a profit motive might be relevant. However, in this case, we are determining only if petitioner is entitled to deduct his pro rata portion of the claimed partnership loss.

[10]*In Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 564 (1979), affd. 633 F.2d 512 (7th Cir. 1980), we also pointed out that in a general partnership, the activities of the partners, as partners, should be considered in determining the trade or business of the partnership, but not the activities of the partners, as individuals.

project. The taxpayer argued that the trade or business test should be applied at the partner level. The expenses then would not constitute nondeductible start-up costs as the taxpayer-partner had previously been actively involved in the real estate development business. In rejecting this argument, we analyzed the language of section 702(b),[11] which provides that the character of any item included in a partner's distributive share is determined as if the partner realized that item directly from the same source as the partnership. We stated that the language contained in section 702(b) has been consistently interpreted to mean that the character of the items comprising the partnership's income or loss is determined at the partnership level. *Goodwin v. Commissioner, supra* at 436. See *Davis v. Commissioner,* 74 T.C. 881, 905–906 (1980), on appeal (6th Cir., Feb. 17, 1981); *Miller v. Commissioner,* 70 T.C. 448, 455–456 (1978); *Podell v. Commissioner,* 55 T.C. 429, 432–434 (1970); *Grove v. Commissioner,* 54 T.C. 799, 803–805 (1970); sec. 1.702–1(b), Income Tax Regs. Cf. *McManus v. Commissioner,* 65 T.C. 197 (1975), affd. 583 F.2d 443 (9th Cir. 1978); *Estate of Freeland v. Commissioner,* 393 F.2d 573, 584 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. In *Goodwin,* we also concluded (75 T.C. at 436–437) that the partnership level characterization approach is consistent with the Supreme Court's statement in *United States v. Basye,* 410 U.S. 441, 448 (1973), that in computing the taxable income of a partnership—

the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners. Once its income is ascertained and reported, its existence may be disregarded since each partner must pay tax on a portion of the total income as if the partnership were merely an agent or conduit through which the income passed.

The issue decided in *Madison Gas & Electric Co.* and *Goodwin* is similar to the issue in the instant case. The issue in those cases required a determination of whether the partnership was engaged in a trade or business within the meaning of

---

[11]Sec. 702(b) provides as follows:

(b) CHARACTER OF ITEMS CONSTITUTING DISTRIBUTIVE SHARE.—The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

section 162(a). The issue in the instant case is whether Britton Properties was engaged in a trade or business within the meaning of sections 162(a) and 167(a). Because of the similarity of the issues, our holding in *Madison Gas & Electric Co.* and *Goodwin* might well be considered to dispose of the question raised in this case of whether the "profit motive" should be determined at the partnership level. However, the approach of making this determination at the partnership level is also consistent with a number of other cases involving section 162 and other provisions of the Code. In *Hager v. Commissioner*, 76 T.C. 759, 782–784 (1981), the taxpayers did not challenge respondent's assertion that section 183 is generally to be applied at the partnership level (although we stated the issue to be the applicability of section 183 at the partnership level, we were more precisely referring at that point in the opinion to whether the taxpayer was entitled to the claimed section 162 deductions; see 76 T.C. at 784). However, in the *Hager* case, we proceeded with a partnership analysis. This analysis was in part based on *Estate of Lanier v. Commissioner*, T.C. Memo. 1980–295, affd. on this issue without published opinion 659 F.2d 1060 (2d Cir. 1981), which reasoned that the partnership level determination was the correct approach because: (1) Of the historical view that for purposes of section 162(a) a partner is really engaged in the business of his partnership (see *Ward v. Commissioner*, 20 T.C. 332, 343 (1953), affd. 224 F.2d 547 (9th Cir. 1955); and (2) the language of section 702(b).[12] See section 1.702–1(b), Income Tax Regs., which provides in part that a partner's distributive share of partnership section 270 "hobby losses" (a provision replaced by section 183) retains that character in the hands of the partner.[13]

In *Van Raden v. Commissioner*, 71 T.C. 1083, 1103 (1979), affd. 650 F.2d 1046 (9th Cir. 1981), we held that section 446(b) applies at the partnership level by relying on the reasoning of *Resnik v. Commissioner*, 66 T.C. 74 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977). In *Resnik*, we began our analysis by citing *United States v. Basye*, 410 U.S. 441, 448 (1973), for the

---

[12]See *Ballich v. Commissioner*, T.C. Memo. 1978–497.

[13]Although sec. 183 was enacted to replace sec. 270, the so-called hobby loss provision, we have held that it is not limited in its application to hobby losses. *Hager v. Commissioner*, 76 T.C. 759, 782 (1981); *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976).

proposition that the partnership is an independently recognizable entity apart from its partners for the purposes of the calculation of its taxable income under section 703. We then concluded that, because section 446(b) refers to the "computation of taxable income" which properly "does clearly reflect income," any question of whether income has been distorted through the use of an improper method of accounting must first be analyzed at the partnership level. In addition, we pointed out in the *Resnik* case that a partnership level analysis is particularly relevant for a limited partnership because a limited partner has no control over the activities of the partnership and the deductions taken in the business conducted by the partnership. In this regard we stated (66 T.C. at 81):

A limited partner has no control over the timing of an interest payment by the partnership. Because the partnership controls the timing of the payment, a scrutiny of that payment as to whether it distorts income must, therefore, first be made at the partnership level. Moreover, if the examination were made first at the partner level to see whether the prepayment of interest by the partnership distorted the partner's income, different results might flow to the different partners, all resulting from an act of the partnership over which the limited partners had no control. Accordingly, we conclude that we must first look at the partnership level to ascertain whether the prepayment of interest results in a distortion of income.

Based on the holdings of the numerous cases above discussed, we conclude that the issue of whether an activity carried on by a partnership amounts to a trade or business must be determined at the partnership level. Therefore, whether the purchase and exploitation of a movie by Britton Properties constituted a trade or business depends on whether the partnership had a profit motive or intent.

In order for a partnership to be entitled to a deduction for expenses attributable to a trade or business in computing its taxable income (or loss) under section 703(a), it must be established that the partnership engaged in the activity with the primary purpose and intent[14] of making a profit. *Hirsch v.*

---

[14]While it may at first appear difficult to ascribe an "intent" to an entity such as the limited partnership herein, we have previously held that "It is the intent of the partnership and not that of any specific partner which is determinative in characterizing the income for purposes of taxation." *Podell v. Commissioner*, 55 T.C. 429, 433 (1970). See also *Miller v. Commissioner*, 70 T.C. 448, 456 (1978), where we looked to the "partnership's motives." In

*Commissioner, supra* at 736; *Golanty v. Commissioner, supra* at 425; *Hager v. Commissioner, supra* at 784. Britton Properties need not have a reasonable expectation of profit, but the partnership must have the intent and objective of realizing a profit.[15] *Hirsch v. Commissioner, supra; Hager v. Commissioner, supra; Jasionowski v. Commissioner,* 66 T.C. 312, 321 (1976); *Bessenyey v. Commissioner,* 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). In determining whether the partnership engaged in the activity for profit, all of the relevant facts and circumstances are to be taken into account (*Golanty v. Commissioner, supra* at 426; *Jasionowski v. Commissioner, supra* at 319), and the burden of proving the intent to make a profit is on petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure. While no one factor is to be determinative, greater weight should be given to the objective facts than to the parties' mere statement of their intent. *Engdahl v. Commissioner,* 72 T.C. 659, 666 (1979); *Churchman v. Commissioner,* 68 T.C. 696, 701 (1977).

A discussion of the scope of the term "activity not engaged in for profit" used in section 183 is contained in section 1.183–2, Income Tax Regs. As this term is phrased in the negative, a conclusion on this issue necessarily revolves around the determination of whether the activity was, in fact, "engaged in for profit." It is on this positive term that the regulation provides a number of helpful guidelines, including a nonexclusive list of nine factors which should normally be taken into

---

this same context, the taxpayer in *Estate of Freeland v. Commissioner,* 393 F.2d 573, 584 (9th Cir. 1968), affg. a Memorandum Opinion of this Court, argued that as a limited partner, the intent of the operating partners in the partnership should not be attributed to her. In rejecting this contention, the Second Circuit stated that while the limited partnership may have been an "investment" to her, the intent of the partnership controlled in determining whether the land owned by the partnership was property described in sec. 1221(1).

[15]We recognize that the standard we have used was recently reviewed in *Dreicer v. Commissioner,* 665 F.2d 1292 (D.C. Cir. 1982), revg. and remanding a Memorandum Opinion of this Court. In *Dreicer,* the Circuit Court, after a review of the legislative history, concluded that the applicable standard is not whether the taxpayer had "a bona fide expectation" of profit but, rather, whether he engaged in the activity with the "objective" of making a profit. The Court correctly stated that sec. 1.183–2(a), Income Tax Regs., provides that the facts must indicate that the taxpayer entered into the activity with "the objective of making a profit." The difference in the standard of "objective of making a profit" and a "bona fide expectation" of making a profit might be merely one of semantics. In any event, the Circuit Court in the *Dreicer* case recognized, as this Court has in many cases, that an activity is not engaged in for profit if the taxpayer does not have the "objective" or "intent" of making a profit, and that the "objective" or "intent" of the taxpayer is a question of fact to be decided in each case from all the evidence of record.

account. As we have discussed above, section 183 is not a disallowance provision, but rather an allowance provision which operates only when the taxpayer's expenses are not allowable as deductions under section 162(a) or 212(1) and (2). Thus, as the profit motive analysis must be resolved *before* turning to section 183, it would appear that section 1.183–2, Income Tax Regs., is misplaced. However, we conclude that since the regulation is not unreasonable and plainly inconsistent as it deals with a specific issue raised in section 183 which requires a determination before that section is applicable, it should be given full force and effect. See *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496 (1948). In addition, since many of the statements in the regulation, including the relevant factors listed, were derived from case law decided prior to the enactment of section 183, it is clear that the standards used in determining whether a profit motive exists for purposes of section 162 or 212 have remained the same. See *Jasionowski v. Commissioner, supra* at 321–322; *Benz v. Commissioner*, 63 T.C. 375, 383 (1974).

The factors listed in section 1.183–2(b), Income Tax Regs., which should normally be taken into account are as follows: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

Respondent contends that Britton Properties was organized and presented to potential investors as a venture designed solely to produce tax deductions and which had virtually no chance from the outset of producing an economic profit. Petitioner contends that Britton Properties was engaged in an activity which was admittedly highly speculative, but in which there was a small chance of making a large profit. Furthermore, he argues that the manner in which Britton Properties operated substantiates his claim that it was engaged in the activity for profit.

Before considering the relevant factors listed in the regulations, we will discuss respondent's argument that the circumstances surrounding the purchase of the movie clearly indicate that from the very beginning, the activity was not carried on in a manner consistent with a profit-seeking motive. First, we have concluded above that Mr. Stern, as general partner, purchased the movie at a price which far exceeded its fair market value. In buying the film at this inflated price, Mr. Stern immediately placed the partnership at a tremendous disadvantage in that, to make any profit, the movie had to generate revenues far in excess of what it could feasibly produce. This action by Mr. Stern insured that this admittedly speculative investment would not break even, let alone produce an economic profit.

In addition to the inflated purchase price attributable to the nonrecourse note, Mr. Stern obligated Britton Properties to pay CSIL, a company of which he was an officer, $330,000 in cash in April 1974, while CSIL had obligated itself to purchase the movie on December 1, 1973, for a cash price of $91,250, which amount was later reduced *after* the sale to Britton Properties, to a cash price of $75,000. It is significant that the records indicate that this reduction in purchase price was not passed on to the partnership. Also, Mr. Stern, as general partner, did not have any type of valuation made of the movie prior to its purchase by the partnership, and the record indicates that the movie was not copyrighted in the United States. Mr. Stern did not even know of any other film in which the star of this film, Lee Van Cleef, had starred as of 1974 which was a financial success. When all of these facts are considered, it is clear that, from the outset, the general partner had effectively destroyed whatever small chance the partnership had of making a profit and insured that it would be an economic failure.

Turning to the relevant factors listed in the regulations, it is quite apparent that the partnership was operated in a nonbusinesslike manner. An important indicator of this fact is the distribution contract between Britton Properties and CSID. Mr. Stern entered into a distribution agreement for the movie with CSID, a company of which he was an officer in 1974. CSID agreed to devote its best efforts to the distribution of the movie, in return for a cash payment of $50,000 plus 70

percent of the first $500,000, 60 percent of the next $250,000, and 50 percent of the balance of the gross proceeds from the theatrical distribution of the movie. Prior to this time, in an agreement dated November 12, 1973, CSID had entered into a distribution agreement with Stellar IV, with basically the same terms and conditions and the exact same percentage payments as a distribution fee, except that there was no provision for the payment of any cash in advance of the distribution of the movie. Another significant difference between the agreements was that Stellar IV was to expend not less than $50,000 for prints, advertising, and promotion within the first 10 months of distribution, while CSID was only obligated to expend $25,000 over 19 months in its agreement with Britton Properties.

The facts clearly show that Mr. Stern entered into essentially the same distribution agreement with CSID as CSID had entered into previously, except that half as much money was to be spent for distribution over a period twice as long, and Britton Properties was to pay a flat fee of $50,000 cash, in addition to the percentage fee. In effect, Mr. Stern obligated the partnership to pay $50,000 cash to CSID, a company of which he was an officer at the time, for distribution services which CSID did not have to render because it had already delegated these duties to Stellar IV. In addition, this cash payment was subsequently agreed to by the general partner, despite the fact that the investors were not even informed at the presentation that an advance cash payment would be required in a distribution agreement. In fact, Dr. Ryder, who was trained by Mr. Friedberg, specifically stated that these exact percentage payments, without the cash payment, would be required under the "typical" distribution agreement.

The actual distribution of the movie also shows that the partnership was operated without a true regard for the profitability of the activity. Although the distribution agreement between Stellar IV and CSID stated that the movie was to be put in full theatrical release by November 15, 1973, the film was not actually released until July 10, 1974. When the movie finally did open, its performance was very poor from the outset. The movie opened for 6 days in July in Lubbock, Tex., and it next played in San Angelo, Tex., for 6 days, and during that same period, it also played in Abilene, Tex. For the period

July 25 through 31, it played in Anderson, S.C., and for the period July 25 through 28, it played in Goldsboro, N.C., and Elkin, N.C. Thus, in its first 3 weeks of distribution, the movie had two play dates in Texas, one in South Carolina, and two in North Carolina, all at drive-in theaters. In addition, the distributor was already accepting play dates of less than 1 week in the very first month of distribution. Although the opening of a movie is critical to its future success, and it is accepted industry knowledge that 70 percent of a film's total gross receipts are earned in the first year of distribution, Mr. Stern did not attempt to make any changes until Mr. Friedberg notified Stellar IV on December 6, 1974, that the distribution agreement would terminate within 15 days.

Petitioner argues that the fact that the partnership did, in fact, change distributors indicates that the partnership was engaged in the activity for profit. It is true that Mr. Stern, in a letter dated April 3, 1975, notified the limited partners that the distributor of the movie had been changed from Stellar IV to World Wide Films, Inc., and that World Wide did distribute the movie in 1975. However, he failed to mention that pursuant to an agreement dated July 5, 1974, Stellar IV had entered into a subdistribution agreement with World Wide. Therefore, in reality, this apparent change was no change at all as World Wide had been the company ultimately responsible for the distribution all along.

The results of petitioner's own efforts provide yet another illustration of the nonbusinesslike manner in which the movie was distributed. In the fall of 1975, petitioner became concerned that, although this was the period of time in which he believed that the movie should begin to be successful even though the distributor had been changed, the movie was not doing very well. He decided to check up on the movie and selected a few of the theaters where the play date schedule indicated that it was playing about that time. Petitioner called approximately four theaters which it had been represented to him had played the movie, and only one of these had ever heard of the movie. He became very concerned and later notified Mr. Stern in writing that of the two theaters in Arkansas and two in Texas that he had called, only one had ever heard of the movie. Petitioner never received any written reply from Mr. Stern. Although the number of reported play

dates increased from 54 in 1974 to 160 in 1975, there was no firm indication as to how many of these theaters actually played the movie. Certainly, petitioner's random sampling provides a very poor assessment of exactly how the distribution was subsequently handled, and Mr. Stern's failure to respond to petitioner's letter provides additional support for the conclusion that the partnership was operated without regard to an economic profit motive.

Petitioner contends that a factor in his favor is that the partnership and CSID, the company in charge of distribution, were run by people who had a high degree of expertise in the movie industry. With respect to Mr. Stern, it is clear that through his past experience as an accountant specializing in tax matters and his work as an investment banker, he was certainly knowledgeable in the area of tax law and in investments in general. However, it is also clear that he had no experience prior to 1973 in the movie industry in general or in the distribution process of films in the United States. Mr. Friedberg had been associated with a number of companies which were involved in some facet of the entertainment industry. For 2 or 3 years, he was associated with a company which distributed films to colleges and universities; however, his participation was unsuccessful as his interest was purchased by the company, at a loss, sometime in 1971 or 1972. From the record then, it is quite apparent that the experience of these individuals in the purchase and distribution of films was not very extensive and certainly had not proved to be financially rewarding to Mr. Friedberg. Based on all of the evidence, including the manner in which the movie "Beyond the Law" was distributed and the losses incurred by the other 18 partnerships which had distribution contracts with CSID, we conclude that petitioner has failed to show that these individuals were true "experts" in this particular area.

Petitioner argues that there was always the possibility, with inflation and the growth of the film industry in general, that the movie would appreciate substantially in value. As we have found, above, the fair market value of this movie would have had to appreciate astronomically even to approach the purchase price paid by Britton Properties. Therefore, we conclude that it is unrealistic to believe that anyone concerned with the partnership had any true expectation that the movie would

appreciate in value to an amount remotely approaching the $1,730,000 stated cost, or even to an amount approaching the $330,000 cash payment.

The final two factors listed in the regulation which we conclude to be of particular significance in this case are (1) the fact that none of the 19 other limited partnerships organized by Mr. Stern and Mr. Friedberg produced an economic profit, much less proved to be an economic "success" and (2) the partnership's record of losses. From 1974 to 1977, the first 4 years of owership of the movie, Britton Properties reported income produced from its movie costing $1,730,000, in the total amount of $5,684. Although its return for 1978 was not available, the income did increase in 1979 to $5,700, or total income for the 5 years of $11,384. Due to the exhaustion of its available depreciation deductions, the partnership did report a profit in 1979 in the amount of $1,148. However, the partnership reported losses of $1,231,063, $318,195, $111,222, and $51,127, for the taxable years 1974 through 1977, respectively, which losses were due principally to depreciation deductions for those years. In view of the magnitude of the losses reported by the partnership, particularly when compared with the amount of income produced during each year of operation, we agree with our statement in *Golanty v. Commissioner, supra,* that "A record of such large losses over so many years is persuasive evidence that the petitioner did not expect to make a profit." *Golanty v. Commissioner, supra* at 427.

Based on the entire record, we conclude that the Britton Properties partnership was not engaged in the ownership and distribution of the movie for profit.[16]

Since the partnership is not entitled to any deductions under section 162, the activity of the partnership constitutes one "not engaged in for profit" as defined in section 183(c). We therefore turn to section 183 to determine the amount, if any,

---

[16]Neither party contends that the lack of profit motive causes Britton Properties to fall outside of the definition of a partnership under secs. 761(a) and 7701(a)(2). Britton Properties was formed by a formal partnership agreement covering the rights and liabilities of the partners, the partnership filed returns of income, and books and records were maintained on behalf of the partnership. On the basis of this record, it appears that Britton Properties was a partnership. See *Madison Gas & Electric Co. v. Commissioner,* 72 T.C. 521, 558–563 (1979), affd. 633 F.2d 512 (7th Cir. 1980); *Luna v. Commissioner,* 42 T.C. 1067, 1077–1078 (1964).

of deductions which are otherwise allowable under section 183(b). We are again faced with the question of whether the allowance provision, section 183(b), is to be applied at the partnership or partner level. For the many reasons stated above, we conclude that section 183(b) should be applied at the partnership level. See sec. 703(a); sec. 1.703–1(a), Income Tax Regs.; *Hager v. Commissioner, supra* at 788. Accordingly, as the partnership did not report any deductions in 1975 which are otherwise allowed without regard to whether the activity is engaged in for profit, the partnership is entitled to the deductions claimed, without inclusion in basis of the nonrecourse note in the amount of $1,400,000, but only to the extent of the gross income derived from the activity in 1975 in the amount of $679. Sec. 183(b)(2). The result of applying section 183(b)(2) is that the partnership in 1975 had income of zero; that is, it had no profit and it had no loss. Therefore, petitioner had no distributive share of income or loss from Britton Properties.[17]

*Decision will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, *J.*, concurring: The opinion of the Court states that, in determining whether the partnership had an actual investment in the movie to the extent of the nonrecourse note, the question is whether "the stated purchase price of the property securing the note unreasonably exceeded its fair market value."

In my opinion, the test should be whether *the principal amount of the note* (not necessarily the purchase price) unreasonably exceeds the fair market value of the property. The test and the concept underlying it were explained as follows in *Hager v. Commissioner*, 76 T.C. 759, 773–774 (1981):

In the usual sale of property, if part or all of the purchase price is deferred,

---

[17]Since petitioner's pro rata share of the partnership's income of $679 was included by respondent in his 1975 income, the result of our holding is that respondent erred in increasing petitioner's income, as reported, by $34 of partnership income but did not err in disallowing petitioner's claimed partnership loss of $15,751.

*the obligation to pay the deferred amount* represents genuine indebtedness and an investment in property. Even if such an obligation is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation still represents genuine indebtedness and an investment in property. *Mayerson v. Commissioner, supra* at 351–352; see *Crane v. Commissioner*, 331 U.S. 1 (1946). However, such conclusions do not follow *when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor* because, under such circumstances, it is patent that the purchaser has no incentive to pay off the obligation. [Emphasis supplied.]

It is true that the headnote of the Court of Appeals in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), states the same test as the opinion of the Court in the instant case. However, in *Estate of Franklin*, there was no difference between the purchase price and the principal amount of the nonrecourse indebtedness. See *Estate of Franklin v. Commissioner*, 544 F.2d at 1049 ("Our focus on the relationship of the fair market value of the property to *the unpaid purchase price*" (emphasis supplied)); *Hager v. Commissioner*, 76 T.C. at 774 ("the court [in *Estate of Franklin*] found that the taxpayers had failed to demonstrate that the purchase price of the motel—*the principal amount of the nonrecourse indebtedness*—was approximately equal to the value of the motel" (emphasis supplied)).

If we are to give recognition to unpaid portions of nonrecourse notes, whether for purposes of interest or of basis for depreciation, then it seems to me that the value comparisons should be as stated in *Hager* and as implied in *Estate of Franklin*—i.e., that fair market value should be compared to the amount of the note.

In the instant case the answer is the same, whether we compare the movie's fair market value to the amount of the note ($1,400,000) or to the purchase price ($1,730,000). Accordingly, I concur.

SIMPSON and NIMS, *JJ.*, agree with this concurring opinion.

WHITAKER, *J.*, dissenting: I respectfully dissent. For the reasons indicated herein, I disagree with the Court's analysis of the profit-motive issue and for that reason with the conclusion reached by the Court. In addition, although of relatively little importance in this case, I believe that the

Court's analysis of section 183, and its application of section 183(b) and section 1.183–2(b), Income Tax Regs., to tax shelter partnerships is incorrect, unnecessary, and, by clear implication, creates an unfortunate discrimination against corporate partners.

## I. The Facts as Found Relevant to the Profit-Motive Issue Support the Conclusion that the Britton Properties Partnership Should Be Recognized for Federal Tax Purposes

In the partnership context, the profit intent must be tested as of the time the partnership was organized and commenced business. The question becomes material at a later time only in response to a contention that the original business or nonbusiness intent has changed. *Commissioner v. Culbertson,* 337 U.S. 733 (1949). Here, the intent must be first tested as of sometime during the first half of 1974, although the tax year 1975 is before the Court, since no one contends that the intent was any different in the second year. Determination of intent in limited partnership circumstances presents a particularly difficult question, especially where, as here, a promoter, with only a minimal partnership interest, is the sole general partner.

Limited partners clearly cede to the general partners both the establishment of business policy and its implementation. *Estate of Freeland v. Commissioner,* 393 F.2d 573 (9th Cir. 1968). However, as this Court has held, that intent cannot be derived from the "separate activities of the partners." *Madison Gas & Electric Co. v. Commissioner,* 72 T.C. 521 (1979). The majority appears to look principally to the activities and to the knowledge (express or implied) of the sole general partner. I cannot believe that determination of this issue should depend on such a limited and subjective focus. My disagreement in this case is not with the majority's findings of fact but rather with the relevance to the determination of profit motive of certain of the facts upon which the majority seems principally to rest its decision.

Respondent's contention appears to be that investment in Britton Properties was presented to the potential limited partners as a mechanism designed to produce solely tax deductions. In apparent support of this contention but without

a finding to this effect, the majority concludes that: "When all of these facts are considered, it is clear that from the outset, the general partner [Michael Stern] had effectively destroyed whatever small chance the partnership had of making a profit and insured that it would be an economic failure." There is no finding, however, that the limited partners at the time of their respective investments knew or should have known that the general partner intended to operate the partnership so as to preclude a profit. Both the record and the Court's findings amply support the conclusion that investment in this limited partnership was presented as a highly speculative venture but one intended to make a profit. While the petitioner in this case, Dr. Brannen, by careful investigation might have determined that the likelihood of profit was too remote to warrant the investment for that purpose, I do not believe that his arguably insufficient investigation is a sufficient cause, either by itself or in conjunction with other facts and circumstances, to support the majority's conclusion. Whether or not Michael Stern knew or should have known that the venture could not produce a profit is not entirely clear, but there is no indication in the record or in the Court's findings that he or any of his business associates communicated to the limited partners facts indicating impossibility of a profit.

The majority's conclusion that the possibility of deriving any profit was precluded by the actions of the general partner in agreeing to the purchase price and the other contracts is grounded on the Court's determination that the film had only a minimal value. However, in order to impute knowledge of this fact to Britton Properties partnership, one must conclude that the failure of the investors to demand a valuation under the circumstances in itself demonstrates that they collectively had a total disinterest in a profit objective or actually knew the facts. I cannot reach that conclusion on the record, and the majority has not so found.

The majority's analysis is essentially in terms of actions and knowledge of the general partner both as to Britton Properties as well as 19 unrelated but similar limited partnerships formed by Mr. Stern or by some of his business associates. Unless, in making this profit motive determination, the Court is constrained to consider only the actions and knowledge of the sole general partner and of his business associates, the

decision is not supportable. The Court has not found, as respondent contends, that the partnership was "presented to the potential investors as a venture designed solely to produce tax deductions," or that reasonable investors would or should have reached that understanding. In the absence of such findings about the investors' motives and knowledge, I conclude that the Britton Properties partnership, the aggregate of all participants, had a business purpose and a profit motive. This is not a case where, as in *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1244 (1981), the Court has found that the petitioner "appeared completely indifferent to the success or failure of the venture."

Tax shelters present a difficult problem not only for the Commissioner but also for the courts. In a typical case, of which this is an example, the limited partnership is established and sold to potential investors essentially in the same manner as any other speculative investment. The entity is given all of the trappings of an investment for profit. Unscrupulous promoters, if well rehearsed, can more often than not persuade the unsophisticated investor to part with his money. The judiciary, itself, has fashioned two potent weapons to use against tax investors who are found to be too gullible or too greedy. Deductions relative to the nonrecourse debt may be disallowed when, as in this case, it is determined, with the benefit of hindsight, that the value of the note grossly exceeded the value of the property securing it. In the egregious case, the partnership may fail of recognition or deductions in excess of income may be disallowed.

Loss of the nonrecourse debt benefits in this case is amply supported. I am not, however, persuaded that we should further penalize the investor limited partners where on the facts known and presented to them it is reasonable to conclude that the partnership was established as an investment vehicle with a profit motive. It is unreasonable, I submit, to reach the opposite conclusion when to do so one must attach controlling importance to facts and actions unknown to the partnership as a whole. The Court goes too far in grounding its decision on its hindsight as to values, on presumptive uncommunicated knowledge of the sole general partner, on the apparent overreaching or deceptive conduct by one or more of the general partner's nonpartnership business associates, and on

the pattern of lack of financial success of some 19 other limited partnerships. The 19 were unconnected to Britton Properties although all 20 were spawned under the direction of a single puppeteer (Richard Friedberg) whose manipulations were certainly unsuspected by petitioner and, presumptively, the other investors. In fact, Mr. Friedberg's activities may not have been fully comprehended by his own business associates, including this partnership's general partner.

## II. The Existence Vel Non of a Profit Motive Will Determine Whether or Not the Britton Properties Partnership Should Be Recognized for Federal Income Tax Purposes

For almost 40 years, it has been accepted that a partnership for Federal tax purposes is created "when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the *profits and losses.*" *Commissioner v. Tower*, 327 U.S. 280, 286 (1946). (Emphasis supplied.) The Supreme Court in *Tower* further stated that the question to be decided is:

whether the partners really and truly intended to join together for the purpose of carrying on business and *sharing in the profits or losses or both.* And their intention in this respect is a question of fact, to be determined from testimony disclosed by their "agreement, considered as a whole, and by their conduct in execution of its provisions." * * * [327 U.S. at 287. Emphasis supplied.]

*Commissioner v. Culbertson, supra,* strongly reaffirms this tax definition of a partnership, and in a series of cases, this Court has stated that one of the essential principles of a partnership is the agreement to share profits. See, for example, *S. & M. Plumbing Co. v. Commissioner,* 55 T.C. 702 (1971); *Podell v. Commissioner,* 55 T.C. 429 (1970).

The majority in note 14 calls attention to the fact that neither petitioner nor respondent contended that the lack of profit motive would cause the partnership to fail recognition for Federal tax purposes. I think the Court in this footnote misreads prior decisional law. I do not read either of the cases cited in the footnote—*Madison Gas & Electric Co. v. Commissioner, supra,* or *Luna v. Commissioner,* 42 T.C. 1067 (1964)—as standing squarely for the proposition that there can be a valid

partnership when profit motive is lacking. Therefore, I believe that the majority is not only departing from the Supreme Court's definition of a partnership, but substantially from our own cases.

In *Madison Gas & Electric Co. v. Commissioner, supra*, we said, but without citation of authority:

> First, the statute [sec. 761 or sec. 7701] does not require a profit motive; rather it merely requires "an unincorporated organization, through or by means of which any business, financial operation, or venture is carried on." The business activity or profit motive test is important in distinguishing partnerships from the mere coownership of property. However, this test is not the only test for what constitutes a partnership for Federal tax purposes. * * * [72 T.C. at 561–562.]

That statement was unnecessary for that decision, however, since we also found that the requisite profit motive was present.

In *Luna v. Commissioner*, 42 T.C. at 1077–1078, we made the general statement that several factors, none of which are exclusive, bear on the determination of whether a partnership exists. Because one of the stated factors was the sharing of a mutual proprietary interest in the net profits and having an obligation to share losses, this case might be seen as supporting the majority's position here. However, there was no contention in *Luna* that, overall, profit motive was lacking so the Court's inclusion of the sharing of profits and losses as only one of the several factors, rather than as a factor whose presence is absolutely crucial to the existence of a partnership for tax purposes, should be seen as mere dictum.

A. Willis, Partnership Taxation, sec. 184.02 (3d ed. 1981), makes the flat statement: "If there is no joint profit motivation, a partnership does not exist, either under the ULPA or for income tax purposes." W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 3.03[3] (1977), is to the same effect. I know of no case where a partnership without a direct or indirect profit motive was recognized for tax purposes.

I recognize that the profit-motive test under section 162 is the same as in the partnership context. In each case, the underlying issue is the presence of a trade or business purpose, which necessarily implies an intention to make a profit. However, the consequences of disallowing business deductions

under section 162 are not necessarily the same as the nonrecognition of the partnership, itself. At any rate, since I find in this case adequate proof of the existence of a profit motive, the result, as I see it, would be the same whether we are applying the profit-motive test under section 162 or under sections 761 and 7701.

### III. Section 183 Should Not Be Extended to Tax Shelter Partnerships

In relying upon section 183(b) to allow deductions to offset the $679 of partnership income allocated to petitioners in 1975, the majority implies that deductions up to the amount of gross income would not have been allowed absent section 183(b)(2).

I believe, however, that this is an incorrect principle. Based on the overall scheme of taxation, established practice, and available analogy, the Court should accept, as a general principle, that gross income can always be offset by expense deductions regardless of whether section 183(b)(2) applies.

Neither section 162 nor section 212 explicitly requires that the taxpayer have a profit motive. All that section 162 requires is that the expenses be "ordinary" and "necessary" and incurred in a "trade or business." Section 212(1) and (2) requires the expenses to relate to the "production of income." A long series of cases under these sections have read into these general requirements the specific requirement that the activity be engaged in for profit. Because the requirement of a profit motive is a judicial gloss on sections 162 and 212, not an ironclad requirement of the Code, itself, the courts have a duty to reasonably interpret this requirement, keeping in mind the overall scheme of taxation and the particular purposes for the deductions involved.

The primary reason for requiring deductions claimed under sections 162 and 212 to satisfy a profit-motive requirement is to prevent taxpayers from deducting, as business expenses, expenses that are personal in nature because they relate not to the earning of income but to a hobby, recreational activity, or other activity in which the possibility of producing income is not a significant motivating factor. With respect to expenses not exceeding gross income, there is no reason for imposing a profit-motive requirement. To the extent the activity actually

produces income, it is not entirely a personal, nonbusiness activity but has a hybrid character. To account for this hybrid nature, deductions not in excess of the amount of gross income should be viewed as expenses incurred by the taxpayer in the process of earning income, rather than as nondeductible personal expenses, and deductions should be allowed for these expenses.

The practice of the Commissioner has been not to inquire whether a profit motive exists unless claimed deductions exceed gross income. When the deductions exceed gross income, a profit-motive inquiry may be undertaken but the lack of a profit motive will cause disallowance of only the difference between the amount of deductions and the gross income from the activity. See *Imbesi v. Commissioner*, 361 F.2d 640 (3d Cir. 1966), revg. on other grounds a Memorandum Opinion of this Court. Because the Government has consistently recognized that the profit-motive requirement applies only to expenses in excess of gross income, and has therefore never attacked deductions up to the amount of gross income from an activity, no court has issued an opinion on whether the lack of an overall profit motive should cause deductions, not in excess of gross income, not to be allowed under sections 162 and 212. I believe it was an accepted principle, even before the enactment of section 183, that profit motive need not be shown to deduct under section 162 or 212 expenses not exceeding gross income from the activity to which the expenses are attributable. The enactment of section 183 was not meant to alter this rule.

Not only does the established practice of the Commissioner support this view but it is also supported by the overall design of chapter 1 of the Code to impose a tax on net income only. Courts should avoid interpreting chapter 1 as a tax on gross receipts instead of net income unless Congress has expressed a specific desire to disallow a deduction of a particular type of expense. See *Commissioner v. Sullivan*, 356 U.S. 27 (1958), in which the Supreme Court, in allowing deductions for rent and wages to a taxpayer conducting an illegal gambling operation, noted that to disallow these deductions would come close to making gambling businesses taxable on gross receipts while all other businesses would be taxable on the basis of net income, and if that choice were to be made, Congress—not the

courts or the Commissioner—should make it. See also *Comeaux v. Commissioner*, 10 T.C. 201, 207 (1948), in which this Court allowed a gambling enterprise to deduct salaries and other expenses and stressed that expenditures made in the actual production of income should be allowed because the "income tax law is not a tax on gross income."

I believe the same approach must be applied in interpreting the "trade or business" or the "production of income" language of sections 162 and 212. There is no congressional indication whatsoever that engaging in an activity without a profit motive should be burdened with a tax on gross receipts from the activity, while taxpayers engaged in profit-oriented activities are entitled to be taxed on net income only. Thus, without reference to section 183, there is no basis for denying petitioners here a deduction for expenses up to the amount of gross income allocated to them by the partnership.

Additionally, I note that recognition of a general rule allowing deductions up to the amount of gross income regardless of the applicability of section 183 is warranted because of the anomalous result that would be reached were such a general rule not to exist. Because section 183 is not applicable to corporations (other than subchapter S corporations), if no such general rule existed, corporations would not be able to deduct expenses up to the amount of income if the expenses were incurred in an activity not engaged in for profit, even though individuals who also lacked profit motive could deduct this type of expense under section 183(b)(2). Furthermore, because the Court indicates that section 183(b)(2) applies to any partnership in which individuals, trusts, estates, or subchapter S corporations are partners, and because it finds that the application of section 183(b) reduces the partnership's income to zero so that it has no profit and no loss, a corporate partner would be allocated no income. Were we not to recognize a general principle of allowing deductions up to the amount of income, a corporation engaging in the same activity directly rather than through a partnership would be treated differently because it would be taxed on gross income from the activity but not allowed any offsetting deductions. To avoid these anomalous results, we should specifically recognize the general principle.

In short, rather than rely on section 183(b)(2) to allow the

deduction of expenses up to the amount of income received by petitioners in 1975, I believe the Court should simply state that the deductions are allowed because of the general principle of allowing deductions up to the amount of gross income. By so doing, the Court would avoid any implication that the deductions would not have been allowed if section 183(b)(2) were inapplicable.

This approach has the further advantage of avoiding the awkward bifurcation of section 183 which the Court adopts in this case when it grafts section 183(b) onto section 162. Clearly, section 183 was enacted to assist the Commissioner and individual taxpayers in resolving the ambiguous circumstances attendant on recreational and hobby-type activities which usually generate expenses in excess of receipts. There is no need to extend it to partnership activities at all, but its framework is particularly inept when the Government seeks to use it, or misuse it, as a weapon with which to wage the tax shelter battle.