ROBERT S. TAFT AND MARLENE R. TAFT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Taft v. Commissioner
Docket No. 25822-83.
United States Tax Court
T.C. Memo 1987-542; 1987 Tax Ct. Memo LEXIS 534; 54 T.C.M. (CCH) 962; T.C.M. (RIA) 87542; October 26, 1987; As amended October 28, 1987 Barry I. Fredericks and David M. Brandes, for the petitioners. Patricia A. Donahue and Nancy M. Vinocur, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income tax returns as follows: Taxable Year
Deficiency
1975
$ 16,375.70
1976
7,686.78
1977
1,956.81
1979
2,195.15
The issues to be decided are: (1) Whether petitioners are entitled to an investment tax credit and miscellaneous deductions in relation to their investment in Chase Expedition *537 Partners, a limited partnership formed to purchase and commercially exploit a motion picture; (2) whether petitioners are liable for additional interest under section 6621(c); [1] and (3) whether petitioners are liable for damages under section 6673. FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners resided in Great Neck, New York, at the time of filing the petition in this case. Robert Taft ("petitioner") is an attorney with a primary field of specialization in tax. He is a member of the bars of the States of New York and Florida, as well as the District of Columbia. Some time during 1975, petitioner was approached by E. Donald Shapiro, a client and social acquaintance, about an opportunity to invest in a motion picture. Petitioner had no prior experience in the film industry. E. Donald *538 Shapiro was an attorney who owned two movie theatres. The investment opportunity had been brought to his attention by his uncle, Erwin Shapiro. Petitioner was told that a young producer, Richard Martin ("Martin") had run out of funds while trying to finish two movies and was unable to get the films out of the lab. Erwin Shapiro told petitioner that he personally knew Martin and felt that his movies would "make it." He also told petitioner the film was a G-rated children's movie. Petitioner described Erwin Shapiro as a "movie entrepreneur." However, there is no evidence in the record reflecting his background, experience or qualifications in the entertainment industry. Petitioner did not conduct any sort of investigation of Martin or the statements made by Erwin Shapiro as to the likelihood of success of Martin's films. Petitioner discussed the opportunity to invest in the film with Edgar Hatfield, another partner in his law firm. Subsequently, petitioner and Hatfield met with an attorney for Berkshire Pictures Corp., an entity owned by Martin and to which Martin had sold the movie, to discuss purchasing the film. The parties entered into an agreement whereby a partnership *539 would be formed specifically to purchase and commercially exploit the film "The Chase Expedition." The parties agreed on a purchase price of one million dollars. The partnership was to provide cash in an amount sufficient to get the film released from the lab, and the balance in the form of a promissory note in an amount approximating the cost of making the movie. Cost was determined by reference to a budget prepared by Martin, the producer, director, and seller, and certified as correct by him. Petitioner was told by Erwin Shapiro that he could trust the certified budget. The total cost of making the film as shown on the budget was $ 950,013. Petitioner did not view the film, nor did he make any attempt to ascertain the veracity of the figures used in Martin's budget. On November 20, 1985, petitioner and his law partners, as well as a few clients and friends, formed a limited partnership known as The Chase Expedition Partners ("the partnership"). Hatfield served as the general partner. Petitioner prepared the partnership agreement and some related documents. The partnership acquired the film "The Chase Expedition" for $ 90,000 cash and a promissory note in the amount of $ *540 910,000 at 8-percent interest. The note was payable only out of net receipts derived from the exploitation of the film as follows: (i) 50 percent of net receipts derived from non-television exhibition in the United States and Canada; (ii) 75 percent of net receipts derived from television exhibition in the United States and Canada; (iii) 75 percent from exhibition in other territories. "Net receipts" was defined as "all gross sums actually paid to [the partnership] by any distributor * * * from the exploitation of the photoplay, after the deduction therefrom * * * of all fees and expenses of such distribution and exploitation which such distributor is entitled to deduct." Payments on the note were to be applied first to interest and then to principal. The note was secured by the film. The note provided that in the event of default, the partnership and its successors, licensees and assigns would have no personal liability on the note, except by reason of tortious or willful misconduct. Since the number and identity of the partners was known prior to formation of the partnership, there was no private placement memorandum or offering materials. However, the partnership did *541 obtain a tax opinion letter from the law firm of Hatfield, Brady & Taft. The opinion letter discussed certain income tax considerations with respect to an investment in the partnership. The opinion letter discussed certain income tax considerations with respect to an investment in the partnership. The opinion noted that the entity would be taxed as a partnership and that each partner's basis would include the amount of cash contributed plus his proportionate share of the partnership's liability on the note. The letter also reviewed the depreciation of the film using the income forecast method, availability of a 10-percent investment tax credit and the potential for recapture. A Confidential Investment Memorandum attached to the partnership agreement highlighted the tax considerations discussed in the opinion letter. Additionally, in a discussion of the economic risks involved, the Memorandum noted that the motion picture business is highly speculative and competitive, that the industry was undergoing significant changes in consumer preferences, and that any single film represented a high risk to its investors. In a later section discussing transferability of the limited partnership *542 interests, the Memorandum emphasized the fact that the interests were not transferable without the consent of the general partner. Therefore, it suggested that persons who anticipated a need for immediate liquidity should not subscribe. It noted, however, that liquidity would be created through after-tax cash-flow, and stated "the potential high tax bracket limited partner may reasonably expect an amount in excess of his invested funds to be generated by after-tax cash-flow at the end of 1975." The Memorandum noted that a distribution contract had been arranged, but it did not contain any projections of income. Petitioner contributed $ 5,000 for a 5-percent interest in Chase Expedition Partners. Neither the general partner nor any of the limited partners ever viewed the film prior to investing, either as individuals or on behalf of the partnership. None of the investors had any background or previous experience in the movie business. The movie is about the search for the son of a U.S. Senator who has disappeared in the wilds of Indonesia. Overall, the film is of low quality. The cast consists of actors unknown to the general public and their performances are sub-standard. The *543 movie is almost entirely narrated with the exception of approximately three minutes of dialogue which is poorly dubbed. Much of the footage appears to be stock footage. One scene in which a giant lizard eats a goat is repeated three times. The film was produced and directed by Richard Martin, who has produced and directed two other low-budget films. The partnership did not obtain an independent appraisal of the value of the film. In a letter to the partnership dated November 20, 1975, Richard Martin estimated that the film would realize gross receipts of between $ 1,200,000 and $ 1,500,000. In a letter to the accountant for the partnership dated February 18, 1976, Martin revised his estimate of the total income to be generated by the movie to approximately $ 20,500. Chase Expedition Partners licensed the right to distribute and exploit the film to Trans World Films, Inc., in an agreement dated November 20, 1975. Richard Martin, the producer, director and seller of the film, was president of Trans World. The agreement provided that gross receipts would be divided in differing percentages depending on whether the source of the revenues was from theatrical or non-theatrical *544 exhibition. The agreement also required Trans World to spend $ 100,000 to have 15 prints of the film made and to advertise and promote the movie. The movie was test-marketed for a one-week period in November 1975. It was shown in nine theatres in Sacramento, California, and generated a total loss of $ 28,845. Trans World was unable to fulfill its obligations as distributor because of financial difficulties. Therefore, at some point in 1976, Erwin Shapiro arranged for an unrelated entity, Worldwide Entertainment Corp. ("Worldwide"), to take over theatrical distribution of the film. The name of the film was changed to "King Monster." Worldwide had no success distributing the movie. In March 1977, Trans World, which was still licensed to exploit the film in non-theatrical venues, sub-licensed its television distribution rights to Gold Key Entertainment ("Gold Key"), also an unrelated entity. The title of the film was again changed to "The Mystery of the Golden Eye." Gold Eye's method of distribution fee of 35 percent "off the top" of total gross receipts and was also entitled to recoup expenses from the remaining receipts. The balance of the revenue would constitute the "producer's *545 share" and would go to the licensor, the partnership. [2]
Gold Key sent quarterly producer's reports to Richard Martin in 1978. At the end of 1978, petitioner also began receiving copies of the reports addressed to Martin. In January 1980, Gold Key began sending reports addressed directly to petitioner and not to Martin. The January 1980 report was the first to show a positive cash flow. The amount shown as due to producer was divided "25% due Chase Expedition [Partners] and 75% due Gold Key." All future reports reflected this 25/75 division of receipts. On May 23, 1984, four years after the 25/75 division was first reflected on the producer's report, petitioner wrote to Gold Key requesting an explanation as to why Gold Key had been retaining 75 percent of the revenues. This question had been raised by respondent's agents during an audit. Gold Key responded that it had purchased a 75-percent interest in the film from Richard Martin in late 1979. Petitioner notified representatives of Gold Key that Martin did not own a 75-percent interest in the *546 movie at the time he purportedly sold it to Gold Key. Petitioner, on behalf of the partnership, offered to quit claim the partnership's 75-percent interest to Gold Key for $ 50,000. Despite the partnership's earlier purchase of the entire film, in an agreement dated June 22, 1984, Chase Expedition Partners agreed to acquire a 25-percent interest in the film from Bershire Pictures Corp. and Richard Martin. The stated consideration for Martin's relinquishment of the 25-percent interest was the $ 90,000 paid to Berkshire on November 20, 1975. Additionally, Berkshire and Martin waived all right, title and interest to both principal and interest of the $ 910,000 promissory note. No payments on the note were ever made. On January 1, 1985 Chase Expedition Partners was dissolved. The 25-percent interest in the film was divided among the individual partners in accordance with their investment in the partnership. The partnership reported the following losses and income for the years 1975 through 1983: Year
Income (Loss)
1975
($ 500,273)
1976
(  363,092)
1977
(   74,936)
1978
none
1979
(   60,442)
1980
10,135
1981
9,161
1982
4,309
1983
668
*547 Petitioner reported the following losses and income from Chase Expedition Partners for the years 1975 through 1984: Year
Income (Loss)
1975
($ 25,014)
1976
(  18,155)
1977
(   3,747)
1978
0
1979
(   3,022)
1980
507
1981
458
1982
215
1983
0
1984
0
Total loss claimed
$ 49,938
Total income reported
1,180
Petitioner also claimed an investment tax credit of $ 5,000 for the film on his 1975 return. OPINION Petitioner argues that his belief that an investment in the movie "The Chase Expedition" was a reasonable and viable business opportunity is sufficient to support his entitlement to tax benefits resulting from that investment. Respondent's primary position, and the one we shall address first, is that Chase Expedition Partners did not engage in its film acquisition and distribution activity with the intention of making a profit. Therefore, respondent argues, the limited partners such as petitioner are not entitled to an investment tax credit and may deduct various expenses and losses only to the extent allowable under section 183. [3]
*548 Section 183 provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in section 183(b). That section allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes, and the balance of the deductions to the extent that gross income from the activity exceeds deductions attributable to such expenses as interest and taxes. Section 183(b)(1), (2). It is well settled that in order to constitute the carrying on of a trade or business under section 162(a), the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hager v. Commissioner,76 T.C. 759, 784 (1981). Whether a partnership is engaged in a trade or business with the intention of making a profit must be established at the partnership level. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion *549 sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984). The expectation of making a profit need not be a reasonable one; it is sufficient if there is a bona fide objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner, supra at 1006. The issue of whether there is the requisite intention to make a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case. Section 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). The burden of proving the intent to make a profit is on petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure. Greater weight is to be given to objective facts rather than to the parties' mere statements of their intent. Section 1.183-2(a), Income Tax Regs.; Fox v. Commissioner, supra at 1007. *550 Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of some relevant factors [Text Deleted by Court Emendation] to be considered in determining whether an activity is engaged in for profit. These factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. At trial and on brief, petitioner has maintained that the activities of Chase Expedition Partners were engaged in for profit. In support of his position, petitioner relies primarily on his own testimony to the effect that the partnership was motivated by a desire to make a profit. However, after an examination of the objective facts and circumstances *551 surrounding the deal, it is apparent to us that the activities of the partnership were not engaged in for profit. In reaching our conclusion, we have been particularly influenced by the circumstances surrounding the initial formation of the partnership and its acquisition of the film. First, the Confidential Investment Memorandum circulated to the anticipated partners was almost totally devoid of any discussion of economic or business considerations. There is no reference to the amount or even the likelihood of profits which an investor might expect. The discussion of the film consists of listing the director, producer, anticipated theatrical release date, and anticipated rating. The memorandum does not consider the particular merits of the movie as an investment vehicle. The memorandum mentions that Trans World had been selected as a distributor, but there is no discussion of Trans World's past experience or success, nor does it reflect that Trans World was yet another Richard Martin entity. The memorandum contained no projections of distribution revenue. Second, it is evident that the partnership acquired the film at a greatly inflated price. The partnership agreed to *552 pay one million dollars for a film directed and produced by an unknown talent which no member of the partnership nor any of their advisors had ever seen. Petitioner has argued that the price paid for the film reflected its value because the price was determined by reference to the cost of making it. However, we agree with respondent's position that the value of the film can better be ascertained by reference to the anticipated revenue. Respondent introduced the testimony of two expert witnesses in support of his position that the value of the film was much less than the one million dollar purchase price. Respondent's first expert, William A. Madden, had formerly been employed by MGM Studios as corporate vice president and general sales manager, a position requiring him to evaluate the theatrical potential of films and to direct their distribution. After retiring from MGM, Madden was employed by several independent distribution companies. He also taught a course at the University of California at Los Angeles on motion picture marketing and distribution. Madden's overall evaluation of the film was that it was poorly made and was substandard in story line, direction, acting, editing *553 and dubbing. In Madden's opinion, the film, "The Chase Expedition" had no fair market value as of November 1975 in the United States and Canadian theatrical markets. Respondent's second expert witness was Robert M. Newgard. Newgard had extensive experience in the distribution of motion pictures to television. He appraised the value of "The Chase Expedition" with respect to television and ancillary markets as of November 1975. In his opinion, the fair market value of the film was $ 60,000. In particular, he noted that the film would derive no revenues from network television because of its weak box office performance, short running time, and overall lack of quality. Petitioner presented no expert testimony with regard to the film's value. Furthermore, at no point in time did the partnership ever obtain an independent appraisal of the value of the movie. Therefore, we find the fair market value of the film to be $ 60,000. We are persuaded that the film was purchased without any true regard for its profitability. Obviously, the cost of making the film would be a factor the producer must consider in determining the profit potential. However, from the partnership's point *554 of view, public acceptance was a much more crucial consideration in predicting income and gauging the film's value. Since the partnership made no effort to investigate marketability of the film prior to its acquisition, we can only conclude that the potential for income was of little concern to the partnership. Furthermore, the record reveals that there were negotiations of the purchase price only with respect to the amount of the cash downpayment. Since the bulk of the purchase price consisted of a non-recourse note secured by the film itself, the partnership did not stand to lose anything if the movie was worthless. Turning to the relevant factors enumerated in section 1.183-2(b) of the regulations, we find that there is ample evidence that the activities of the partnership were not conducted in a business-like manner. The partnership made no attempt to investigate Martin's background or experience in the film industry with respect to either his activity as a producer/director or as distributor via Trans World. Additionally, despite an awareness of Martin's financial difficulties, the partnership nevertheless licensed Martin's entity, Trans World, to distribute the movie. *555 Accordingly, it must have come as no surprise that Trans World was unable to commercially exploit the movie due to its financial problems. Furthermore, the partnership took no action as it became apparent that Trans World and the Worldwide were having no success distributing the movie. Erwin Shapiro arranged for Worldwide to take over theatrical distribution and later Trans World sublicensed its rights to television distribution to Gold Key. In each of these situations, the partnership merely responded to the new arrangements. Among the other factors relevant to our section 183 inquiry is the lack of expertise of nearly everyone involved in this deal. The general partner, Edgar Hatfield, had no previous experience in the entertainment business, nor did petitioner or any of the other limited partners. Petitioner, and presumably the general partner also, relied primarily upon E. Donald Shapiro, an attorney who owned two movie theatres, and his uncle, Erwin Shapiro. Nothing in the record suggests that either of these two people had any particular expertise in the movie production and distribution business. The next factor significant to our inquiry is the time and effort expended *556 by the taxpayer in carrying on the activity. Aside from the initial organizational documents, the record lacks any indication that the general partner ever again acted on behalf of the partnership. Petitioner's activity is evidenced by an occasional letter to the partnership's accountant and then a flurry of letters to Gold Key dealing with the dispute over 75 percent of the proceeds. However, even that participation by petitioner on behalf of the partnership occurred over four years after the division of receipts was first reflected on a producer's report. Furthermore, it appears that the issue of the division of receipts was first brought to petitioner's attention by respondent's agents in the course of an audit, and we believe petitioner pursued the issue only to satisfy the agent's inquiries. The final two factors listed in the regulations that are relevant to this case are the partnership's record of losses, and the amount of occasional profits which were earned. In the years 1975 through 1979, the partnership reported nearly one million dollars of losses. In the period from 1980 through 1983, the partnership reported total income in the amount of $ 24,273. A record of *557 such large losses and so little income is persuasive evidence that the partnership did not intend to make a profit. See Brannen v. Commissioner,78 T.C. 471, 512 (1982), affd. 772 F.2d 695 (11th Cir. 1984). Based on the entire record, we conclude that petitioner has failed to sustain his burden of proving that Chase Expedition Partners was engaged in the ownership and distribution of the movie for profit. Accordingly, petitioner's deductions attributable to that activity are subject to the limits of section 183(b). Section 183(b)(1) allows a deduction for interest paid or accrued since it is a deduction allowable without regard to whether the activity is engaged in for profit. See sec. 163(a). The partnership deduced $ 8,377 as accrued interest in 1975 and $ 72,800 in each of 1976 and 1977. To be deductible under section 162(a), interest must be paid on genuine indebtedness; that is indebtedness in substance and not merely in form. Knetsch v. United States,364 U.S. 361 (1960). In cases involving nonrecourse indebtedness such as we have here, [4] the indebtedness is genuine and has substance only if the value of the underlying *558 security bears a reasonable relationship to the amount of the indebtedness. Beck v. Commissioner,74 T.C. 1534, 1552 (1980), affd. 678 F.2d 818 (9th Cir. 1982); Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975). The fair market value of the film was $ 60,000. Since the film represents the only security for the $ 910,000 note, the partnership had no economic incentive to repay the debt. Under these circumstances, we must conclude that the note was not a genuine indebtedness. [5] Accordingly, the interest is not deductible. Finally, no miscellaneous deductions are allowable although the partnership generated nominal gross income during some of the years in issue since those deductions were not substantiated. *559 Respondent also disallowed petitioner's claimed investment tax credit on the ground that the partnership was not an activity engaged in for profit. An investment tax credit is available only for property with respect to which depreciation is allowable. Sec. 48(a). Depreciation deductions are available only with respect to property which is used in trade or business or held for the production of income. Sec. 167(a). We have already determined that Chase Expedition Partners did not acquire and distribute the film with the intention of making a profit. Consequently, we conclude that petitioner is not entitled to claim an investment tax credit with respect to the film. Section 6621(c)
Respondent has moved for a determination that the deficiencies at issue here are due to tax motivated transactions, for purposes of computing interest on the deficiencies. Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $ 1,000) attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates types of transactions which are to be considered "tax motivated *560 transactions." These transactions include (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. [Sec. 6621(c)(3)(A).] Our first consideration in determining the applicability of the provisions of section 6621(c) is to determine which of the deductions and credits claimed by petitioners, if any, were the result of tax motivated transactions within the meaning of section 6621(c)(3)(A). We disallowed petitioner's claims for depreciation and miscellaneous deductions because we conclude that under section 183 the activity of the Partnership was not engaged in for profit. The Treasury has promulgated temporary regulations which state that "[a]ny deduction disallowed for any period under section 183" is subject to the provision for additional interest set forth in section 6621(c). Sec. 301.6621-2T, A-4(1), Proced. & Admin. *561 Regs. (Temporary), 49 Fed. Reg. 59394 (Dec. 28, 1984). These Temporary Regulations were adopted under the authority of section 6621(c)(3)(B). The evidence is overwhelming that the deductions in issue here are "tax motivated;" and application of the Temporary Regulations to the deficiencies attributable to disallowance of these deductions is consistent with the express provisions and implicit policy of section 6621(c). Rose v. Commissioner,88 T.C. 386, 427 (1987). Accordingly, respondent is entitled to additional interest accruing after December 31, 1984, on the portion of the deficiency attributable to these disallowed deductions. he partnership claimed an investment tax credit for the movie based upon the cost of $ 1,000,000, and petitioner claimed $ 5,000 as his share of that credit. We determined the fair market value of the movie to be $ 60,000. Section 6621(c)(3)(A)(i) includes as a tax motivated transaction any valuation overstatement (within the meaning of section 6659(c)). Section 6659(c) provides that there is a valuation overstatement "if the value of any property * * * claimed on any return is 150 percent or more of the amount determined *562 to be the correct amount of such valuation * * *." Clearly, the $ 1,000,000 claimed value is greater than 150 percent of the $ 60,000 value determined to be correct. Therefore, respondent is entitled to additional interest on the portion of the deficiency attributable to the disallowance of the investment tax credit. Finally, we disallowed petitioner's claimed deductions for his share of interest paid by the partnership in 1975, 1976 and 1977 because we found that the nonrecourse note underlying such interest was not a bona fide debt. Section 6621(c)(3)(A)(v) lists as one category of tax motivated transactions "any sham or fraudulent transaction." We believe that a holding that a debt is not bona fide is indistinguishable from a holding that a debt lacks economic substance and thus is a sham within the meaning of section 6621(c)(3)(A)(v). See Patin v. Commissioner,88 T.C. 1086 (1987). [6] Accordingly, we hold that these claimed interest deductions were the result of tax motivated transactions, and respondent is entitled to the additional interest under section 6621(c) with respect to them. Respondent's motion will be granted. *563 Section 6673
Finally, we consider respondent's motion requesting an award of damages in the amount of $ 5,000 under section 6673. Section 6673 provides that damages of up to $ 5,000 shall be awarded to the United States when it appears that a taxpayer has instituted or maintained proceedings primarily for delay or that the taxpayer's position is frivolous or groundless. After a review of the record in this case, we have concluded that petitioner's position here was not so lacking in merit as to constitute a frivolous or groundless position. Additionally, since petitioner has already paid the deficiency, we are reluctant to conclude that this case was instituted for purposes of delay. Accordingly, we are not persuaded that this case is an appropriate one for the imposition of damages, and respondent's motion will be denied. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. Former section 6621(d) was redesignated as section 6621(c) pursuant to section 1511(c), Tax Reform Act of 1986, 100 Stat. 2744. ↩
2. In April 1977, following the death of Edgar Hatfield, the limited partnership was reformed as a general partnership. ↩
3. This case was tried and briefed under the profit objective analysis of section 183. We have decided it on this basis. Consequently, we do not analyze the transaction at issue herein using the "unified approach" of Rose v. Commissioner,88 T.C. 386, 414↩ (1987). 4. We are not persuaded by petitioner's argument that the language in the note providing "purchasers * * * shall have no personal liability * * * except by reason of tortious or willful misconduct" operated to render members of the partnership personally liable for the debt. ↩
5. We note that in Brannen v. Commissioner,78 T.C. 471 (1982), affd. 772 F.2d 695 (11th Cir. 1984), we stated that the test was whether the stated purchase price unreasonably exceeds the value of the property (78 T.C. at 493), whereas in Hager v. Commissioner,76 T.C. 759 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeds the value of the property (76 T.C. at 773). We do not decide which test is appropriate on the facts before us (see Brannen v. Commissioner,78 T.C. at 513↩ (Chabot, J., concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the film. 6. See Schwartz v. Commissioner,T.C. Memo. 1987-381↩.